Joe SOLIS, d/b/a Gulf Queen Seafoods, Charles C. Cobb, Pace Fish Co., Inc., a Texas Corporation, and Dan W. Coley, and Gulf Breeze, Inc., a Texas Corporation

v.

Robert MILES, as District Supervisor of the Texas Parks and Wildlife Department, and Texas Parks and Wildlife Department.

Civ. A. No. B-81-198.

United States District Court, S. D. Texas, Brownsville Division.

Oct. 15, 1981.

McGinnis, Lockridge & Kilgore, Shannon H. Ratliff, Austin, Tex., and Arnall, Golden & Gregory, Marc L. Peterzell, Atlanta, Ga., for plaintiffs.

Mark White, Atty. Gen. of Texas, Richard E. Gray, III, Executive Asst. Atty. Gen., and Brian E. Berwick, Asst. Atty. Gen., Environmental Protection Division, Austin, Tex., for defendants.

Baker & Botts, Larry F. York, Houston, Tex., for Gulf Coast Conservation Ass'n, amicus curiae.

## MEMORANDUM OPINION

DeANDA, District Judge.

This is an action for injunctive and declaratory relief attacking the constitutionality of an act of the Texas Legislature, House Bill 1000, Chapter 153, 1981 Tex.

Sess. Law Serv. 374 (Vernon). House Bill 1000 amends or repeals various sections of the Texas Parks and Wildlife Code. Those sections under attack here deal with the banning of commercial fishing for redfish (sciaenops ocellata) and speckled sea trout (synoscion nebulosus) in Texas waters and the regulation of imports of redfish (also called red drum) and speckled sea trout from outside of Texas.

Section 1 of House Bill 1000 bans the sale, transportation and possession for sale of redfish and speckled sea trout except for those raised on licensed fish farms and those legally taken outside the state if tagged, packaged or labelled under regulations of the Texas Parks and Wildlife Commission.[1] Section 14 of House Bill 1000 repeals earlier Sections 47.019, 47.020, 47.-0531, 61.902 and 61.061–.068 of the Parks and Wildlife Code regulating commercial red drum fishing. Section 13 of House Bill 1000 empowers the Texas Parks and Wildlife Commission to regulate commercial fishing for redfish and speckled sea trout. Sections 1 and 14 became effective September 1, 1981. Section 13 becomes effective September 1, 1983.

There are five Plaintiffs. Two were, at the time this suit was filed, commercial fishermen. Three are fish dealers. The two fishermen (Plaintiffs Coley and Cobb) and two fish dealers (Plaintiffs Pace and Solis) challenge the ban on commercial fishing for and sale of redfish and speckled sea trout. Plaintiff Pace and Plaintiff Gulf Breeze, Inc., challenge the import regulations issued by the Commission.

Plaintiffs contend that House Bill 1000 is unconstitutional because it contravenes both the Fourteenth Amendment's guarantee of equal protection of laws and also contravenes the Commerce Clause, U.S. Const. Art. I, § 8, cl. 3.

This suit was filed on August 17, 1981. A temporary restraining order enjoining enforcement of the challenged laws was denied by this Court. A hearing on Plaintiffs' application for temporary injunction was held on September 14 and September 15, 1981. Additional deposition evidence was allowed to be filed after the hearing.

■ Since failure to meet any one of the four requirements for issuance of a temporary injunction established by *Canal Au-*

---

1. Section 1 of House Bill 1000 reads:

Section 1. Section 66.201, Parks and Wildlife Code, is amended to read as follows:

*Sec. 66.201. Redfish and Speckled Sea Trout*

(a) No person may possess or transport for the purpose of sale a redfish or speckled sea trout.

(b) No person may sell or offer for sale a redfish or speckled sea trout.

(c) No person may purchase or offer to purchase for resale a redfish or speckled sea trout.

(d) A person who violates this section is guilty of a misdemeanor and on conviction is punishable by a fine of $200. Each fish possessed, sold, offered for sale, purchased, or attempted to be purchased in violation of this section is a separate offense.

(e) In this code:

(1) "Redfish" means red drum or sciaenops ocellata and includes all parts of that fish.

(2) "Speckled sea trout" means cynoscion nebulosus and includes all parts of that fish.

(f) This section applies to the possession, transportation, sale, and purchase of redfish and speckled sea trout without regard to where the fish was caught, but does not apply to:

(1) The transportation and possession of redfish and speckled sea trout caught outside this state to a point of delivery outside this state;

(2) redfish and speckled sea trout that are raised by a licensed fish farmer in a private pond and are marked or identified as provided by the rules of the commission under Chapter 48 of this code; or

(3) the importation into this state of lawfully taken, caught, or raised redfish or speckled sea trout, transported or sold when not alive, if tagged, packaged, or labeled under regulations of the commission. The commission may require that redfish and speckled sea trout enter the stream of commerce for sale in Texas in a state allowing ready identification of the species, including a requirement that the fish come into the state with head and tail intact and tagged. The commission shall allow subsequent sale of lawfully imported fish without head and tail intact and without tag provided the fish are labeled in a manner prescribed by the commission and the tag when removed is destroyed. Tags, if required, shall be of a type prescribed by the commission and shall be sold to applicants at cost as determined by the commission.

thority of *State of Florida v. Callaway*, 489 F.2d 567 (5th Cir. 1974) will result in its denial, this opinion shall center on the requirement that Plaintiffs have failed to meet—that of a substantial chance of success on the merits. Plaintiffs have demonstrated no chance of success on the merits in their equal protection claims. They have demonstrated a substantial probability of success on only one of their Commerce Clause claims. Except as to that claim, Plaintiffs' application for a Temporary Injunction must therefore be denied. Furthermore, based on the conclusions reached herein, the Court is convinced that insofar as Plaintiffs' claims are based on a denial of equal protection of laws, no further evidence need be presented, and pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure, judgment can be entered.

## EQUAL PROTECTION

The threshold question is whether the two-year ban on commercial fishing unconstitutionally denies Plaintiffs the equal protection of the law. The purpose of the regulations governing the importation of redfish and speckled sea trout caught outside of Texas' waters is to aid in the enforcement of the ban on commercial fishing. Those regulations can only withstand an attack based on the Commerce Clause if the ban itself is constitutional. If it is not, then Texas has no legitimate purpose in regulating the importation of redfish and speckled sea trout. Without a legitimate state purpose, any burden on interstate commerce imposed by the regulations violates the Commerce Clause. However, if the ban does not violate the Constitution then aiding its enforcement is a legitimate purpose, and it can be upheld if the burden is not excessive in relation to the local benefits. See, *Hunt v. Washington Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).

■ All parties agree that the classification involved here, commercial and noncommercial fishing, must be judged by the "rational basis" standard. *Sisk v. Texas Parks and Wildlife Dept.*, 644 F.2d 1056 (5th Cir. 1981). To invalidate a legislative classification that does not involve a suspect distinction or infringe a fundamental interest, Plaintiffs must show that the challenged classification bears no rational relationship to a legitimate state interest. *See, e. g., Vance v. Bradley*, 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979); *New Orleans v. Dukes*, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976).

The burden of persuasion Plaintiffs must overcome to invalidate House Bill 1000 is a heavy one. The state's legislation is presumed to be constitutional, *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961), and this presumption can be overcome only by negating "every conceivable basis which might support it." *Madden v. Kentucky*, 309 U.S. 83 (1940). "Statutory classifications will be set aside only if no grounds can be conceived to justify them." *McDonald v. Board of Election Commissioners*, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969). "The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the state's purpose." *McGowan, supra*, 366 U.S. at 430, 81 S.Ct. at 1107.

■ There was no formal legislative history for House Bill 1000 nor any statement of legislative purpose incorporated therein. In the absence of legislative articulation of purposes, any legitimate purpose to which the legislation is rationally related will serve to uphold it. *See, Delaware River Basin Commission v. Bucks County Water & Sewer Authority*, 641 F.2d 1087 (3rd Cir. 1981); *accord, Alabama State Federation of Teachers v. James*, 656 F.2d 193 (5th Cir. 1981). *See also, Flemming v. Nestor*, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960).[2]

---

**2.** The absence of legislative history or statement of purpose also necessitated this Court, out of perhaps an excess of caution, to conduct a full evidentiary hearing. *See, Minnesota v. Cloverleaf Creamery*, 449 U.S. at 469, n.9, 101 S.Ct. at 726, n.9 (1981).

Plaintiffs have launched a two-fold attack on the rationality of House Bill 1000. First, they have attacked the legislative assumption that redfish and speckled sea trout populations are in decline by presenting evidence which questions the reliability of that evidence which was presented to the legislature and by also presenting evidence which affirmatively seeks to demonstrate that the fish populations in question are not in decline. Alternatively, they have argued and presented evidence seeking to demonstrate that the ban on commercial fishing cannot be said to be rationally related to the goal of protecting the fish populations in question.

Plaintiffs' attack on the empirical rather than theoretical connection between House Bill 1000 and protecting redfish and speckled sea trout populations is similar to that brought by the plaintiffs in *Minnesota v. Cloverleaf Creamery,* 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981). There, plaintiffs presented evidence challenging the *consequences* of a Minnesota law banning plastic non-returnable milk containers. Plaintiffs sought to show that the law could only exacerbate the problems it sought to correct. The evidence was apparently in "sharp conflict," and the lower court resolved the conflict in favor of the challenge to the statute. This was, the Supreme Court said, "a patent violation of the principles governing rationality analysis under the Equal Protection Clause." *Id.* 449 U.S. at 464, 101 S.Ct. at 724.

Here, Plaintiffs have attacked not the consequences, but the underlying factual basis for the legislative assumption that redfish and speckled sea trout populations are in need of protection. Here, too, the evidence is in conflict. However, it is not for this court to determine whether redfish or speckled sea trout populations are de-clining, increasing or stable. Nor is it for this Court to decide whether the fish need more, less, or no protection. These are decisions for the legislature. This Court's role is greatly limited:

> In ordinary civil litigation, the question frequently is which party has shown that a disputed historical fact is more likely than not to be true. In an equal protection case of this type, however, those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decision maker.

*Vance v. Bradley,* 440 U.S. at 110, 111, 99 S.Ct. at 949. *See also, U. S. v. Carolene Products,* 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1937). (Legislative determination that filled milk is not a wholesome food product.)

The evidence at the hearing revealed a strong scientific dispute over both the affected fish populations (Compare testimony of Dr. Hildebrand with that of Dr. Hubbs and Mr. Kemp.) and over the methodologies used by the Texas Parks and Wildlife Department to estimate fish populations.[3] (Compare the testimony of Dr. John Stockton and Harvey Bullis to that of Gary Matlock.) The existence of such a sharp dispute among scientific professionals points directly to the conclusion that a decline in redfish and speckled sea trout populations is at least debatable.

It is also significant to note that Mr. Kemp, Dr. Hubbs, Dr. Hildebrand and also Plaintiff Pace all testified before the House Committee on Environmental Affairs when it considered House Bill 1000. (See House Committee Report attached as exhibit to Defendants' Answer to Motion for Tempo-

---

**3.** Plaintiffs' attempted demonstration of the unreliability of the data underlying Texas Parks and Wildlife Department's determination that the fish population is declining neither destroys all evidence of a decline (see testimony of Mr. Kemp and of Louis Garcia) nor allows them a clear field over which to run. Because Legislators are also free to draw from their own knowledge and experience the state need not always present empirical or statistical evidence. *Vance, supra,* 440 U.S. at 110, 99 S.Ct. at 949. *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976). Even if fish populations are not declining, it is logical to assume banning commercial fishing will reduce fishing pressure and thereby aid in the protection of fish populations.

rary Restraining Order.) The testimony given there was similar to that presented to the Court. (See testimony of Hildebrand, Kemp and Gary Matlock.) Some fifteen others also testified before the Committee. The bill was amended in Committee and sent to the floor of the House by a 7 to 2 vote.[4] From this it must be concluded that the Legislature, too, was aware of the existence of a dispute concerning redfish and speckled sea trout populations. The adoption of House Bill 1000 indicates that that dispute was resolved in favor of the position that the populations were indeed declining. For this Court to rule otherwise would be the substitution of its judgment for that of the legislature. This has been time and time again condemned by the Supreme Court. *See, e. g., Cloverleaf Creamery, supra,* 449 U.S. at 469, 101 S.Ct. at 726. *New Orleans v. Dukes, supra; Ferguson v. Skrupa,* 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963); *Day-Brite Lighting, Inc. v. Missouri,* 342 U.S. 421, 72 S.Ct. 405, 96 L.Ed. 469 (1952).

Plaintiffs further argue that even if the fish populations are declining the legislature's action in banning commercial fishing is irrational. Actions to reduce fishing pressures, they argue, should be applied evenhandedly or at the very most should be applied to the areas of greatest pressure.

■ The evidence is uncontested that sport fishermen take the greatest number of speckled sea trout. Plaintiffs contend that banning a less threatening predator (commercial fishermen) while allowing the greatest predator to continue is irrational.

Plaintiffs have confused rationality with wisdom. It cannot be gainsaid that banning commercial fishing will reduce or at least retard any increase in fishing pressures. That there might be better or more fair ways to achieve this purpose does not invalidate the means chosen. *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970).

The ban on commercial fishing contained in House Bill 1000 is part of an overall legislative scheme for the regulation and protection of redfish and speckled sea trout populations. The ban is absolute for only two years; when Section 13 becomes effective in 1983, the Texas Parks and Wildlife Commission will have the authority to allow, under regulations established by it, renewed commercial fishing. The Commission is also given the power to set open and closed seasons for sport fishing and to set bag and size limits in those areas where it has jurisdiction to do so.[5] The legislature may "implement its program step by step ... adopting regulations that only partly ameliorate a perceived evil and deferring complete elimination to future regulations." *New Orleans v. Dukes, supra,* 427 U.S. at 303, 96 S.Ct. at 2516.[6]

■ In short, this Court finds that House Bill 1000 is indeed rationally related to its purpose. If the law is unwise or unnecessary, Plaintiffs' remedy lies not with the courts but with the legislature. Under our system, they are free to approach their representatives with the same evidence and the same efforts that they have marshaled in

---

4. A comparable history of proceedings in the Texas Senate is lacking.

5. The authority of the Texas Parks and Wildlife Commission under the Uniform Wildlife Regulatory Act, Chapter 61, Texas Parks and Wildlife Code, is determined on a county by county basis. *Texas Parks and Wildlife Code Ann.* § 61.003 and § 101.001 *et seq.*

6. Plaintiffs have also attacked House Bill 1000 as having allocation rather than conservation as its actual purpose. Even if the Court felt that this was the case, it would uphold the Act. Allocation of natural resources is a legitimate state interest. It is also a particularly legislative task. The legislative process is better suit-

ed for the give and take and compromise necessary for allocations than is the adversarial, highly formalized and individual dispute-oriented process utilized in litigation. When done within the constraints of the United States Constitution, the courts will not interfere. Allocation among competing user groups is not *per se* violative of the Constitution. Considering the number of people involved in sport fishing, compared to commercial fishing, the relative impact each has on fish populations, and the comparative economic benefits of both activities, this particular allocation is neither arbitrary nor capricious nor infringes upon any fundamental rights.

the presentation of this case. If the law is unwise or unnecessary, the legislature is free to abolish it. If the law is unnecessarily harsh, the legislature is free to ameliorate its effects. The majoritarian political process, not litigation, is the proper avenue for Plaintiffs' grievances.

## COMMERCE CLAUSE

Were it not for the Supreme Court's decision in *Hughes v. Oklahoma,* 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979), Plaintiffs' arguments that House Bill 1000 and the regulations promulgated thereunder violate the Commerce Clause would merit little more than cursory consideration. The *Hughes* decision, however, brought state fish and game laws and regulations within the purview of the Commerce Clause. In overruling *Geer v. Connecticut,* 161 U.S. 519, 16 S.Ct. 600, 40 L.Ed. 793 (1896), the Court put to death the common-law legal fiction of state ownership of wild fish and game. The Court recognized that conservation and protection of wild animals is certainly a legitimate state purpose, but held that "States may promote this legitimate purpose only in ways consistent with the basic principle that 'our economic unit is the nation.'" *Id.* 441 U.S. at 339, 99 S.Ct. at 1738, quoting *H.P. Hood & Sons, Inc. v. DuMond,* 336 U.S. 525, 534, 69 S.Ct. 657, 663, 93 L.Ed. 865 (1949).

The Commerce Clause not only empowers Congress to legislate concerning interstate commerce, but has long been held to also act as a bar to state actions which would discriminate against or unreasonably burden interstate commerce. *See, Minnesota v. Cloverleaf Creamery, supra; Hughes v. Oklahoma, supra.* State legislation which amounts to "simple economic protectionism" is almost "*per se* invalid." *Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). Legislation with otherwise valid purposes is also subject to being invalidated if it unreasonably burdens interstate commerce. *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).

**7.** See n.1.

House Bill 1000 cannot be read to intentionally discriminate against interstate commerce. (Indeed, those most adversely affected by it are the Texas fish industry and fishermen.) No Texas industry is placed in a better position by this act than any similar out-of-state operators. Commercial fishing has been banned to all. If anything, this acts as a boon to out-of-state fishermen who may now market their products in Texas without local competition. Finding that the act operates "evenhandedly" however, does not terminate the inquiry into its burdening of interstate commerce:

> "Where the state regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on commerce is clearly excessive in relation to the putative local benefits...the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Pike, supra,* 397 U.S. at 142, 90 S.Ct. at 847.

The burden on interstate commerce here is conformity with the import regulations prescribed by Section (f)(3) and (g).[7] These sections allow the continued importation of redfish and speckled sea trout pursuant to regulations of the Texas Parks and Wildlife Commission. The only mandatory regulation is that allowing subsequent sale of lawfully imported fish with head and tail removed. The statute itself imposes no burden other than a five-dollar license' which no one can seriously argue is "clearly excessive." The burdens imposed by the statute itself cannot therefore be attacked as constitutionally infirm.

Any attack must be made instead upon the regulations issued by the Texas Parks and Wildlife Commission. These regulations are the "teeth" of House Bill 1000; they prescribe the conditions under which importation of redfish and speckled trout

may continue. Emergency regulations were passed on August 14, 1981.[8] They are challenged here.

Plaintiffs challenge the regulations as being overly burdensome because they ban the import of fillets, prevent the import of fish involved from neighboring jurisdictions, and increase the cost of doing business. These burdens stem from two requirements—that fish be imported with head and tails intact (Section 57.373(a)) thereby proscribing importation of fillets; and the packaging, labelling and invoice requirements (Sections 57.372 and 57.374) which prevent bulk importation and increase handling and record keeping costs. Each places a separate burden on commerce and each requires separate analysis.

The state's interest involved in promulgating these regulations is its law enforcement interest. The regulations do not directly affect or protect Texas redfish and speckled sea trout populations except inso-

far as they aid in the enforcement of the ban on commercial fishing. By regulating the importation and sale of redfish and speckled sea trout, the state seeks to prevent circumvention of its law. This is a legitimate state interest. *Andrus v. Allred*, 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979); *Bayside Fish Flour Co. v. Gentry*, 297 U.S. 422, 56 S.Ct. 513, 80 L.Ed. 772 (1936).

## THE PACKAGING REQUIREMENTS

The regulations require that all shipments of redfish and speckled sea trout be packaged, labelled and accompanied by an invoice. The contents of the label and the invoice are determined by the Executive Director of the Texas Parks and Wildlife Department.[9]

■ Plaintiffs' first attack on these regulations is based not on Commerce Clause

---

**8.** The relevant regulations are:

   *§ 57.371. Finfish Import License.*
   (a) A Texas finfish import license is required of any person importing, transporting, or selling for resale dead redfish or speckled sea trout taken, caught, or raised in any other state or country.

   *§ 57.372. Packaging Requirements.*
   (a) All packaged shipments of redfish and speckled sea trout by licensees shall be accompanied by an Import or Intrastate Invoice.
   (b) An import invoice shall:
      (1) accompany all shipments of redfish and speckled sea trout entering the state for distribution within the state;
      (2) contain information and be of a form prescribed by the Executive Director of the Texas Parks and Wildlife Department;
      (3) be sequentially numbered; and
      (4) be retained by the licensee for a period of at least one year from the date of receipt of shipment.
   (c) An intrastate invoice shall:
      (1) accompany all shipments of redfish and speckled sea trout shipped from within the state to a destination within the state;
      (2) contain information and be of a form prescribed by the Executive Director of the Texas Parks and Wildlife Department;
      (3) be sequentially numbered; and
      (4) be retained by the recipient for a period of at least one year from the date of receipt of shipment.
   (d) One copy of each import and intrastate invoice received or completed by each purchaser during each month shall be submitted to the

Parks and Wildlife Department on or before the 10th day of the following month.
   *§ 57.374. Package Labels.*
   (a) Each package of redfish or speckled sea trout shall be labeled.
   (b) The label shall contain the following information:
      (1) import and intrastate invoice number;
      (2) number and weight of whole fish or fillets by species contained in the package;
      (3) Texas finfish import license number of the shipper (if shipped from within Texas) and the receiver (if fish are to be sold for resale);
      (4) name and address of each shipper and receiver; and
      (5) other information as prescribed by the Executive Director of the Texas Parks and Wildlife Department.

**9.** Information distributed by the Parks and Wildlife Department (Plaintiffs' Exhibit 39) states:

   Invoice forms are not supplied by the Texas Parks and Wildlife Department. It is the responsibility of the finfish import license holder to have forms printed. However the forms must conform to the example attached. Package labels are not supplied by Texas Parks and Wildlife Department. It is the responsibility of the finfish import license holder to have labels printed. However the labels must conform to the example attached.
(The example attached is contained in the Appendix.)

grounds but as violations of the Due Process Clause of the Fourteenth Amendment. They argue that the regulations are void because they are too vague and should not therefore be enforced against them. *Winters v. New York*, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948). Defendants counter by suggesting that this Court should abstain from deciding these issues until Texas courts have had an opportunity to clarify the regulations. *Railroad Commission v. Pullman*, 312 U.S. 496, 61 S.Ct 643, 85 L.Ed. 971 (1941). The Court finds no need or justification for exercising its discretion to abstain regarding the invoice and labelling requirements but for reasons pertaining to Commerce Clause considerations rather than Due Process it will abstain from ruling on the vagueness of the term "packaging."

All of the required information to be included on the labels and the invoices has been determined and announced. Plaintiffs cannot be understood to complain that they have not been advised of what is required. Their attack on a lack of apportionment of responsibility for inaccuracies is also faulty. Section 1(h) of § 66.201 apprises the license holder that possession of fish not properly packaged is illegal.

The burdens placed on interstate commerce by the invoicing and labelling requirements are minimal at best. They require no new facilities to be built, only new methods of handling and accounting. They do increase the costs of these goods when compared to unregulated fish, but this cost is not excessive when compared to the benefits received by Texas. Since the Texas redfish or speckled trout is indistinguishable from his Louisiana or Mexican neighbor, some effort to prevent a covert depletion of the local supply is necessary. Invoicing and labelling requirements allow Texas Parks and Wildlife Department to monitor fish sales and shipments and aid in the prevention of the sale of Texas-caught redfish and speckled sea trout.

The term "package" is nowhere defined in either House Bill 1000 or its implementing regulations. The parameters of these packaging requirements must be known before any attempt can be made to determine what burden they might place on interstate commerce. Any construction given by a court will necessarily affect the amount of that burden and therefore its constitutionality under the Commerce Clause. A broadly construed packaging requirement could easily cure any Commerce Clause difficulties. Where a state court interpretation could avoid or modify the constitutional question is one of the "special circumstances" justifying *Pullman*-type abstention. *Zwickler v. Koota*, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967). *Harrison v. NAACP*, 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959). Since this Court's decision could disrupt a complex state administrative scheme, *see, Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), and since it is state judges who will be called upon to enforce this statute, it is they who should be given the first opportunity to define its terms. Accordingly, this Court will abstain from any decision concerning either alleged vagueness of the packaging requirement or of the packaging requirements' constitutionality under the Commerce Clause.

### THE HEAD AND TAILS REQUIREMENT

Although the statute itself and the labelling and invoice requirements pass constitutional muster, the same cannot be said for the "head and tails" requirement. Section 57.373 reads:

(a) All packaged redfish and speckled sea trout entering this state for sale shall be packaged with heads and tails intact.

(b) Redfish and speckled sea trout lawfully imported into this state and subsequently sold in this state may be possessed or transported without heads and/or tails intact.

The practical effect of this regulation is to ban the import of redfish and speckled sea trout fillets while allowing their sale and distribution if they are filleted in Texas. Whether viewed as a direct discrimination against interstate commerce or as only an incidental burden, the regulation is in violation of the Commerce Clause.

The evidence reveals that Plaintiff Gulf Breeze, Inc., imports and sells frozen speckled sea trout fillets. These fillets are prepared from fish caught in the Campeche Bay region of southern Mexico. They are processed locally and then shipped by truck to the United States. The fish are packed in five-pound cartons within a fifty-pound master carton. The packers in Mexico label each master carton for source, type of fish, and bulk weight. (See deposition of Louis Pashos.)

Under these regulations, those filleting operations now performed in Mexico would have to be performed in Texas. "The Court has viewed with particular suspicion state statutes requiring business operations to be performed in the home state that could be more effectively performed elsewhere." *Pike, supra*, 397 U.S. at 137, 90 S.Ct. 844, 25 L.Ed.2d 174; *see, e. g., Toomer v. Witsell*, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1958); *Foster Packing Co. v. Haydel*, 278 U.S. 1, 49 S.Ct. 1, 73 L.Ed. 147 (1926); *Johnson v. Haydel*, 278 U.S. 16, 49 S.Ct. 6, 73 L.Ed. 155 (1926). This is a burden placed on the entire interstate market and not just individual firms. *Compare, Hughes v. Oklahoma, supra*, with *Exxon Corporation v. Governor of Maryland*, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978).

Once discrimination is shown, "the burden falls upon the State to justify it both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake." *Hunt v. Washington Apple Advertising Commission*, 432 U.S. 333, 353, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977). The State urges this regulation as an enforcement aid because fillets are indistinguishable both as to source and as to species. This is certainly a legitimate state purpose. It is, however, so remotely related to the goal of House Bill 1000 (or of any other articulated legitimate state purpose) that the local benefits likely to be derived from it are slight and could be just as easily obtained by less discriminatory means. All of the evidence is in agreement on the proposition that fish fillets are indistinguishable. Still, it does not follow that banning the importation of redfish and sea trout fillets will result in easier detection of the sale of Texas-caught redfish and speckled sea trout. As long as other species of fillets can be marketed, redfish and speckled sea trout fillets could be marketed as those of another species. Only a ban on the sale of all fillets will allow identification of the marketed fish product, but such a ban is specifically proscribed by Section 1 of House Bill 1000.

Similarly, if viewed as an aid to the identification of the source of the fillets sold in Texas, the regulations fall short of the mark. Only fillets of redfish and speckled sea trout are required to be labelled with license and import numbers. Other fillets bear no such identification requirements.

If viewed as an aid in the identification of the source of only those fillets which are represented to be redfish or speckled sea trout, the regulations must still be held invalid because there are less restrictive means to the same end. The same labelling, licensing, and invoicing scheme which is used for fillets processed in Texas could be easily adapted for those processed outside the state. The unlawful discrimination against interstate commerce would cease and any burden imposed by such evenhanded scheme would in all probability pass constitutional muster.

Plaintiff Gulf Breeze, Inc., has thus demonstrated a high probability of success on the merits of its claim that Regulation Section 57.373 unconstitutionally violates the Commerce Clause. For purposes of the preliminary injunction hearing, the other three prerequisites for its issuance were stipulated and the Court so finds that they have indeed been met. Because these proceedings are still at the preliminary injunction stage and in recognition of the haste with which these emergency regulations were drawn, the Court will issue at this time only a preliminary injunction against the enforcement of Regulation Section 57.373. If,

after this preliminary injunction has been issued, Defendants do not choose to adopt permanent regulations in conformance with the United States Constitution, a further hearing shall be held whereby the State may attempt to bear its burden of persuasion to demonstrate that these regulations are indeed constitutional.

An appropriate Order incorporating the conclusions and findings of this Memorandum shall be entered.

### APPENDIX

This is the example finfish invoice; presumably, the package label is the same. (No other example was attached.)

TEXAS FINFISH INVOICE

INVOICE NO. _____

| From | | |
|------|---|---|
| Street Address | | |
| City | State | Zip Code |

| To | | |
|------|---|---|
| Street Address | | |
| City | State | Zip Code |

TYPE OF SHIPMENT (check ONE box only):

☐ INTERSTATE (Point of origin not in Texas and destination in Texas) Receiver's Texas Finfish Import License No. _____

☐ INTRASTATE (Point of origin and destination both in Texas) Shipper's Texas Finfish Import License No. _____

| DO NOT USE | DESCRIPTION OF SHIPMENT (Redfish or Spotted Seatrout) | WHOLE FISH | | FILLETS * | | STATE |
|---|---|---|---|---|---|---|
| | | NO. OF FISH | NET SHIPPING WEIGHT (lbs.) | NO. OF FILLETS * | NET SHIPPING WEIGHT (lbs.) | COUNT OF OR |
| | | | | * | * | |
| | | | | * | * | |
| | | | | * | * | |
| | | | | * | * | |

* - INTRASTATE SHIPMENTS ONLY