**LOUISIANA SEAFOOD MNGT. COUNCIL, INC., et al.**

v.

**Murphy J. FOSTER, Jr., Governor, Richard P. Ieyoub, Attorney General, et al.**

Civil Action No. 96–106.

United States District Court, E.D. Louisiana.

Feb. 29, 1996.

· Paul R. Baier, Baton Rouge, LA, Robert A. Barnett, Guste, Barnett & Shushan, New Orleans, LA, for plaintiffs.

Thomas E. Balhoff, Baton Rouge, LA, Judith Ruth Atkinson, Roedel, Parsons, Hill & Koch, Baton Rouge, LA, for intervenor-plaintiff.

Frederick Coller Whitrock, Louisiana Dept. of Justice, Public Protection Division, Baton Rouge, LA, Thomas Michael Landrum, Donald E. Puckett, Laura Heap, Louisiana Dept. of Wildlife and Fisheries, Baton Rouge, LA, for defendants.

## *ORDER*

PORTEOUS, District Judge.

Before the Court, is Plaintiffs' Motion for a Preliminary Injunction, pursuant to Fed. R.Civ.P. 65(a), that was taken under submission after a hearing, which included documentary evidence, live testimony of witnesses, and oral argument by counsel, on the 18th of January 1996. The Preliminary Injunction requested seeks to enjoin the Louisiana Governor, Attorney General, and various other Louisiana Officials from enforcing the Louisiana Marine Resources Conservation Act of 1995 ("ACT NO. 1316"). Having considered the arguments of counsel, the applicable jurisprudence, and the volumes of documents submitted for the Court's review, the

Plaintiffs' Motion for Preliminary Injunction of ACT. NO. 1316 is, hereby, **GRANTED**, in part, and **DENIED**, in part.

## I.) FACTUAL BACKGROUND:

Plaintiffs' filed their petition and motion for a temporary restraining order ("TRO") on the 11th of January 1996. The application for a TRO was denied based on the Court's availability for an expedited preliminary injunction hearing on the 18th of January 1996 and the failure of proof that irreparable harm would be suffered in the interim. The dispute in this case arises from House Bill No. 815 or the Louisiana Marine Resources Conservation Act of 1995, that ultimately became ACT NO. 1316, which amended and reenacted significant portions of La.R.S. § 56. Plaintiffs are seeking a preliminary injunction to stop various Louisiana officials from enforcing ACT NO. 1316. In the alternative, Plaintiffs request a preliminary injunction on specific provisions of ACT NO. 1316 claiming that these alleged unconstitutional portions should be severed from the statute.

## II.) SEVERABILITY OF UNCONSTITUTIONAL PROVISIONS

This Court agrees with defendants' proposition that the Louisiana Legislature is the steward of Louisiana's natural·resources as set out in the Louisiana Constitution Article IX, Section 1, which, in pertinent part, states:

> The natural resources of the state ... shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people. The Legislature shall enact laws to implement this policy.

However, it is the manner in which the Legislature protects these resources that represents the conflict before the Court. In determining the "means" that the legislature will use to arrive at the legitimate "end" of conservation, they may not enact statutes in conflict with Federal law, the Equal Protection Clause of the 14th Amendment, the Due Process Clause of the 14th Amendment, the Commerce Clause in Article I, Section 8, or any other provision of the United States Constitution and/or Louisiana Constitution.

For all enjoined provisions of ACT NO. 1316, the Court will utilize the Severability clause found in La.R.S. 24:175, which provides, in part:

> (A.) ... the provisions of each act of the legislature are severable, whether or not a provision to that effect is included in the act. If any provision or item of an act, or the application thereof, is held invalid, such invalidity shall not affect other provisions, items, or applications of the act which can be given effect without the invalid provision, item, or application.
>
> (B.) This Section shall apply to all acts of the legislature ...

■ The Court is troubled with its position in acting as a surgeon carving out all of the enjoined provisions that have not passed Constitutional scrutiny. Severability is authorized unless the unconstitutional portions of the statute are so interrelated and connected with the Constitutional parts ·that they cannot be separated without destroying the intention manifested by the Legislature in passing the act. The Louisiana Supreme Court in *State v. Cinel*, 646 So.2d 309 (La. 1994), *citing State v. Johnson*, 343 So.2d 705 (La.1977), has further refined the test for severability as, "whether or not the legislature would have passed the statute had it been presented with the invalid features removed." *Cinel* at 314. This Court finds the *Cinel* test to be satisfied considering the amount of substantive changes that will remain in the commercial fishing regulations ·even without the severed portions included. These severed portions, which will be addressed later in the Order, are excluded only for the purpose of granting a preliminary injunction and do not permanently change the statute until further Order of the Court.

## III.) STANDARD FOR PRELIMINARY INJUNCTION

■ The four factors, as listed in *Buchanan v. U.S. Postal Service*, 508 F.2d 259 (5th Cir.1975), *citing 11A Charles A. Wright, Arthur R. Miller and Mary Kay Kane, Federal Practice and Procedure*, § 2948, which must be considered prior to issuance of a Preliminary Injunction are as follows:

(1) Is there a substantial likelihood that plaintiffs will prevail on the merits?

(2) Is there a substantial threat that plaintiffs will suffer irreparable injury if interlocutory injunctive relief is not granted? [1]

(3) Does the threatened injury to plaintiffs outweigh the threatened harm the injunction may do to defendants?

(4) Will a granting of a preliminary injunction disserve the public interest? *Buchanan*, p. 266.

These factors will be considered for the statute as a whole as well as for each individual portion of the statute. Only segments of the statute that meet all four of the factors, with the exception of preemption, will be discussed in this Order for Preliminary Injunction. The area of preemption will be discussed in an attempt to shed light on this unsettled area of law.

## IV.) DISCUSSION OF PREEMPTION AND THE EXCLUSIVE ECONOMIC ZONE (EEZ)

■ It is well established that the Supremacy Clause [2] of the United States Constitution nullifies state laws that "interfere with, or are contrary to" federal law. *Gibbons v. Ogden*, 9 Wheat 1, 211, 6 L.Ed. 23 (1824). Federal law may supersede state law in several different ways. First, Congress may indicate an intent to preempt all state law in a particular field by so stating this intent. *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). Second, without the expressed preemptive language, Congress' intent may be inferred when comprehensive regulations leave "no room" for state supplemental regulation. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Third, state law is nullified to

the extent that it actually conflicts with Federal law and compliance with both regulations is a physical impossibility. *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963). Plaintiffs allege that all three forms of preemption are present in their memorandum in support of a preliminary injunction. This Court, respectfully, disagrees. While Plaintiffs' arguments are not without merit, they have failed to satisfy the first requirement for a preliminary injunction that they have a substantial likelihood of prevailing on the merits with respect to the entirety of ACT NO. 1316.

In years previous to the Magnuson Act, states were allowed to regulate beyond their territorial waters because there were few Federal Fishery Regulations on the books. During this period, the U.S. Supreme Court was confronted with several cases that raised the issue of preemption of state regulations in, or affecting, federal waters. In *Skiriotes v. Florida*, 313 U.S. 69, 77, 61 S.Ct. 924, 929, 85 L.Ed. 1193 (1941), the U.S. Supreme Court held that in matters affecting its legitimate interest a state may regulate the conduct of its citizens on the high seas as long as there was no conflicting Federal provision. More specifically, the Court recognized that a state's interest in preserving nearby fisheries is a sufficiently strong basis to permit extraterritorial enforcement of state laws. [3] The Fifth Circuit followed this reasoning in *Felton v. Hodges*, 374 F.2d 337 (5th Cir.1967) when they held that Florida could enforce its crawfish regulations beyond the seaward boundary in Federal waters because of its interest in conservation and no conflicting Federal regulations.

The Magnuson Act, 16 U.S.C. § 1811, et seq., expresses Congress' intent to control the exclusive fishery management authority

---

1. "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary. [Additionally,] when the potential economic loss is so great as to threaten the existence of the moving party's business, then a preliminary injunction may be granted, even though the amount of direct financial harm readily is ascertainable." *11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, § 2948.1, p. 160–161, (1995).*

2. United States Constitution, Art. VI, cl. 2.

3. See also, *New York ex rel. Silz v. Hesterberg*, 211 U.S. 31, 29 S.Ct. 10, 53 L.Ed. 75 (1908) where a statute was upheld because it protected the food supply for citizens of the state even though it made illegal, within the state, otherwise legal game birds.

beginning at the state's seaward boundary (three miles seaward from the state's coastline) to a line drawn in such a manner that each point is 200 nautical miles from the outer boundary of each state's territorial waters. This area is often referred to as the Exclusive Economic Zone ("EEZ"). The Magnuson Act established eight regional fishery councils and provided that management of fishery resources within each region is to be conducted pursuant to Fishery Management Plans ("FMP") prepared by each council for certain species of fish within its region. Congress established the Magnuson Act to conserve and manage the harvesting of a valuable marine resource, saltwater finfish, as well as to inject uniformity into regulations governing the EEZ. While the Magnuson Act expresses Congress' plan to occupy regulation of the EEZ[4], complete preemption of state authority is not intended. *People v. Weeren*, 26 Cal.3d 654, 163 Cal.Rptr. 255, 607 P.2d 1279 (1980). In 16 U.S.C. § 1856(a)(3), Congress expressly granted authority for state regulation as follows:

> Except as otherwise provided by paragraph (2), a State may not directly or indirectly regulate any fishing vessel outside of its boundaries, **unless the vessel is registered under the law of that State.** (emphasis added)[5]

When the Courts were confronted with the issue of what effect to give a state statute that conflicted with an FMP in the EEZ, they have invariably held that the state statute must surrender, by way of the Supremacy Clause, to the FMP. In *Southeastern Fisheries Association, Inc. v. Chiles*, 979 F.2d 1504 (11th Cir.1992), the 11th Circuit suggested that a state statute could be preempted when it conflicted with an FMP that established an annual quota for total catch of Spanish Mackerel in the EEZ. Under the FMP, plaintiffs could catch Spanish Mackerel in the EEZ and land their catch in Florida until the FMP's quota had been reached. It would be impossible for plaintiffs to land their quota in compliance with both federal and state regulations because the amount allowed by the FMP was larger than the state quota for Spanish Mackerel. The difference in poundage between the FMP and state statute formed the basis for preemption.

In a similar case, *Vietnamese Fishermen Assn. of America v. California Department of Fish and Game*, 816 F.Supp. 1468 (N.D.Cal.1993), the District Court struck a state statute that prohibited the use of gill or trammel nets to harvest rockfish in Federal waters off of California's coast. While there was an FMP in place prohibiting netting north of a geographical mark, the FMP was silent as to the netting activities occurring south of the same geographical mark. The Court enjoined the state regulation because it prohibited netting in the EEZ, while the FMP, by its silence, had no such restriction. Once again, compliance with both state and Federal regulations was a physical impossibility and required preemption.

■ Neither *Vietnamese Fishermen* nor *Chiles* is analogous to the case before the Court. Both of these cases had FMP's in place and used this fact as the basis for finding preemption of the state statute. While the FMP in *Vietnamese Fishermen* was silent as to the disputed area in the EEZ, this Court distinguishes that case from the current litigation because ACT NO. 1316 is only enforced in state territorial waters and does not regulate activity in the Federal EEZ. The case of *Chiles* is also distinguishable because the FMP specifically dealt with the harvesting of Spanish Mackerel and the state statute conflicted with this regulation by setting a lower poundage restriction that prematurely closed the season. The case at hand does not seek enforcement in the EEZ, as in *Vietnamese Fishermen*, and it does not conflict with an FMP, as in *Chiles*. While the issue of the preemptive effect of the

---

4. In § 1811(a) Congress claims for the United States "sovereign rights and exclusive management authority over all fish (except highly migratory species) ... within the exclusive economic zone."

5. The Court, respectfully, disagrees with the interpretation given to the state's power as mentioned in FN4 of *Chiles* at p. 1508. This Court reads the Act as carving out an exception for state regulation if the boat is registered with the state.

Magnuson Act when there is no FMP remains res nova in the Federal Circuits and the U.S. Supreme Court, it has been addressed in several State Supreme Court decisions which will be examined for their persuasive authority.

This issue was addressed by the Supreme Court of Florida in *Raffield v. State,* 565 So.2d 704 (Fla.1990). The case involved an owner of a fish processing plant that received a federal permit to catch red fish in the EEZ with a gill net. The red fish were caught in Louisiana waters, landed in Louisiana, and transported to Florida for processing. Plaintiffs were later arrested in Florida for possession of fish caught with a gill net. The Court held that no preemption had occurred because the Florida statute only prohibited possession of finfish captured with a gill net within the state's domain (territorial waters and land).[6] *Id.* at 705. In so holding, the Court distinguished all previous cases [7] that required preemption because *Raffield* did not present the situation where the state was attempting to apply its statute within the EEZ. *Id.* at 706.

In another state court decision, *People v. Weeren,* 26 Cal.3d 654, 163 Cal.Rptr. 255, 607 P.2d 1279, the Supreme Court of California held that a state statute which prohibited the taking of broadbill swordfish with the assistance of a spotter aircraft could be enforced in the Federal EEZ. The Court reached this decision based on the fact that there was no conflict between California and Federal Swordfish policies because no FMP had been promulgated under the Magnuson Act.[8] California facilities were to be used for the landing and processing of the swordfish, so the Court held that the state's interest in enforcing the regulation was "both real and continuing." *People,* 163 Cal.Rptr. at 262, 607 P.2d at 1286.

This Court agrees with the California Supreme Court's interpretation concerning the applicability of state regulations, in the ab-

sence of FMPs, to fish harvested in the EEZ. ACT NO. 1316 is less offensive to the Magnuson Act than the statute upheld in *People* because Louisiana is not enforcing its regulations outside of Louisiana waters. ACT NO. 1316 only prohibits possession (landing) of certain finfish within the territorial waters of Louisiana and does not seek enforcement within the EEZ. The statute in question is more analogous to the statute in *Raffield* because it only attempts to regulate activity and possession of finfish in the state.

Under Louisiana law, a fisherman in the EEZ can catch numerous species of fish, illegal in state waters, using various types of apparatus and never be affected by ACT NO. 1316 as long as he does not land the fish in Louisiana waters. This Court believes that the spirit and purpose of the Magnuson Act is to protect and conserve saltwater finfish. Using plaintiffs' interpretation, the underlying objective of Congress in creating the Magnuson Act is violated. Before the Act, the state could exercise authority in the EEZ as long as there were no conflicting Federal provisions. After the Magnuson Act, plaintiffs' interpretation suggests a "free for all" scenario where if there is no FMP, nothing can be done by the state to stop the landing of otherwise prohibited finfish. This interpretation would handcuff the state's abilities to protect valuable marine resources and would cause all finfish landed in Louisiana to be classified as caught in the EEZ. The Court will not read the Magnuson Act to place the state in such a precarious predicament and for the foregoing reasons the preliminary injunction on the basis of preemption is, hereby, **DENIED.**

**V.) WEEKEND COMMERCIAL FISHING**

■ Sections § 56:325.3(C)(1), § 56:325.4(A), and § 56:333(B)(1) prohibit commercial fishing for speckled trout, other saltwater finfish, and mullet during the peri-

---

6. See also, *State v. Millington,* 377 So.2d 685 (Fla.1979) where the Supreme Court of Florida upheld a similar statute regulating the possession of shrimp because there was no conflicting federal regulations. The restriction acted as a shield against the depletion of the local supply and made evasion of the law less easy.

7. *Southeastern Fisheries Assn, Inc. v. Department of Natural Resources,* 453 So.2d 1351 (Fla.1984).

8. See also, dicta in *State v. Sterling,* 448 A.2d 785, 787 (R.I.1982).

od from 5:00 a.m. on Saturday through 6:00 p.m. on Sunday ("weekends"). Plaintiffs have alleged that these provisions are repugnant to the Constitution because they violate the Commerce Clause found in Article I, Section 8, cl. 3, of the United States Constitution which, in part, states:

> The Congress shall have the Power ... To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes ...

Although this Clause only speaks in terms of powers bestowed upon Congress, the Court has also interpreted the language to limit the power of the states to "erect barriers against interstate trade." *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 35, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980).

In determining whether a state has overstepped its boundary in regulating interstate commerce, the U.S. Supreme Court has distinguished between statutes that only incidentally burden interstate commerce and those that affirmatively discriminate against such transactions. *Maine v. Taylor*, 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986). The statutes that only incidentally burden interstate commerce are struck if the burdens placed on commerce are "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). Those statutes that affirmatively discriminate against interstate commerce are subject to a more demanding scrutiny that requires the state to prove both that the statute serves a legitimate local purpose and that this purpose could not be served as well by available nondiscriminatory means. *Maine*, 477 U.S. p. 138, 106 S.Ct. p. 2447. See also, *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 353, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977).

The provisions in question fall into the category of statutes that have only incidental effects on interstate commerce. The incidental effects in this particular case are the deprivation of finfish that would have been harvested but for the restriction against weekend fishing. As conceded by all parties, Louisiana is one of the most fruitful fisheries in the entire nation. Finfish, and their byproducts, harvested in Louisiana are transported not only within the continental United States, but all over the world. These provisions that prohibit commercial fishing on the weekends have a incidental burden on interstate commerce because commerce is being deprived of the finfish, and byproducts, which would be captured and transported in interstate commerce.

The question now becomes whether the burden placed on interstate commerce by the weekend exclusion is clearly excessive in relation to the putative local benefits that Louisiana derives from the prohibition. *Hunt*, p. 353, 97 S.Ct. p. 2446. This Court has searched for the local benefits that are served through the exclusion and has found only two possibilities: the ban would allow for fewer days of fishing during the open seasons, or it may prevent a clash between commercial and recreational fishermen. This Court finds both arguments equally without merit. No viable conservation objective [9] can be accomplished by prohibiting commercial fishermen from weekends but allowing recreational fishermen exclusive access to a public resource. Both categories of fishermen can pose a threat to marine resources and there is no conservation reason to support the ban of only one on the weekends. As for the other possible benefit, there has been no evidence of an actual problem between the two classes of fishermen or that a prohibition of commercial fishermen on the weekends is the best alternative if there is a problem. Since the Commerce Clause violation is incidental, the state does not have to show that no other less offensive methods exists, but they do have to establish that the burden on commerce is outweighed by the putative local benefits. This Court finds, for preliminary injunction purposes, the probability that plaintiffs would win on the merits is high and that all other factors for a preliminary injunction have been satisfied. For the forgoing reasons, the plaintiffs request for a Pre-

---

**9.** "Section 1. This Act shall be known as and may be referred to as The Marine Resources Conservation Act of 1995" (emphasis added).

liminary Injunction is, hereby, **GRANTED** as to **All Sentences Prohibiting Weekend Commercial Fishing Found in La.R.S. § 56:325.3(C)(1), § 56:325.4(A), and § 56:333(B)(1).**

## VI.) COMMERCIAL ROD & REEL FISHERMEN AND SOCIAL SECURITY NUMBER REQUIREMENT

■ Plaintiffs suggest that the state's classification of commercial fishermen violates the Equal Protection Clause found in Section 1 of the 14th Amendment. The Equal Protection Clause requires that the government justify its decision to treat two classes of individuals differently by a relevant difference between the two classes. These classifications are valid unless they bear no rational relationship to the state's objectives. *New York City Transit Authority v. Beazer*, 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979). This Court believes that a classification drawn between commercial fishermen or between commercial and recreational fishermen must be analyzed by using the "Rational Basis" standard. *Solis v. Miles*, 524 F.Supp. 1069, 1072 (S.D.Tex.1981); *LaBauve v. Wildlife & Fisheries Comm'n*, 444 F.Supp. 1370, 1381 (E.D.La.1978); *New York State Trawlers Ass'n v. Jorling*, 16 F.3d 1303, 1309 (2d Cir.1994).

As to the standards governing Rational Basis analysis, they are well established in the case law. The Courts have consistently required that legislation classify persons that it affects in a manner rationally related to a legitimate governmental objective. *Schweiker v. Wilson*, 450 U.S. 221, 230, 101 S.Ct. 1074, 1080, 67 L.Ed.2d 186 (1981). This is not a difficult burden for the state to meet when it is acting in good faith, however, the Rational Basis standard is "not a toothless one." *Mathews v. Lucas*, 427 U.S. 495, 510, 96 S.Ct. 2755, 2764, 49 L.Ed.2d 651 (1976). The classification scheme is required to rationally advance a reasonable and identifiable governmental objective. *Schweiker*, 450 U.S. p. 235, 101 S.Ct. p. 1083.

The disputed classification stems from the requirement that a rod & reel commercial fisherman must have acquired a gill net license in two of the past three years to be eligible for a commercial rod & reel license this year. In the past, there was no such requirement on rod & reel fishermen to purchase a gill net license because they are not gill net fishermen and had no need for the license. Exclusion of past rod and reel fishermen simply because they did not possess a gill net license strikes this Court as either a mistake in the statute or a completely arbitrary classification. This group of fishermen was using the least intrusive form of fishing even when set nets were allowed; why now should this group be punished because they did not purchase a gill net license is contrary to reason. This Court cannot conceive how this restriction could serve the legitimate governmental objective of conservation. Additionally, the Court notes that the other requirements have been met to satisfy the issuance of a preliminary injunction. It is for these reasons that the Plaintiffs' motion for preliminary injunction is **GRANTED** as to the **Two out of Three Year Provision Found in La.R.S. § 56:305(B)(14)(a).**

For the Record, all parties consent that a mistake remains in ACT NO. 1316 with respect to the requirement of no Social Security number to receive a net tag for certain species of finfish. A preliminary injunction is **GRANTED** for **La.R.S. § 56:325.3(C)(4), § 56:325.4(B)(4), § 56:333(B)(5), and § 56:406(A)(3)(e)** only for the limited purpose of allowing issuance of a net tag to an applicant that has a social security number. Even if the parties did not consent to this reading of the above provisions, the Equal Protection Clause would have required the same result.

## VII.) TRAVERSAL AND PER NET FEE FOR FISHING IN THE EEZ

■ The last sentence of La.R.S. § 56:305.5(B) requires commercial fishermen traveling to the EEZ from Louisiana waters to purchase a "Traversing Fee Permit" at a cost of $250.00 per year. In addition to this traversing fee, La.R.S. § 56:305(B)(4)(b), (c), & (d) requires commercial fishermen to purchase "Commercial Gear Licenses" at a cost of $250.00 per net. The evidence indicates that commercial fishermen customarily bring three nets to the EEZ because of varying size requirements imposed on different species of finfish. The total fees collected is

approximately $1,000.00. per year per commercial fishermen for traversing Louisiana waters to and from the EEZ. This amendment to La.R.S. § 56:305(B)(4)[10] represents a substantial increase in fees and only allows fishing in the EEZ with a gill net and restricts the use of both mullet and pompano strike nets. Defendants suggest the increase in fees is required for enforcement purposes. However, this Court has received no evidence of why such an increase is required when the privileges and economic value of the licenses have been substantially decreased. The Court views the EEZ fees as having an incidental burden on interstate commerce. This incidental burden must be outweighed by the putative local benefits served in Louisiana for the EEZ fees to be upheld. *Pike* at 142. At this time, the defendants have not met their burden in showing that the considerable increase in fees is necessary for enforcement purposes. The Court finds that plaintiffs have satisfied the preliminary injunction requirement of probability of prevailing on the merits. The irreparable injury requirement is also satisfied because the increase in fees may act as a barrier or burden for some individuals that wish to net fish in the EEZ and cannot pay the increased fees.

For reference purposes only, the Court has reviewed other state statutes to determine how EEZ fees are treated in neighboring states. The Court notes that Florida's stringent net ban law has a similar provision, Fla.R.S. § 370.092(7), for licenses issued for commercial fishing in the EEZ. However, these licenses are issued "free of charge and need not be renewed."

**ACCORDINGLY, IT IS ORDERED** that a Preliminary Injunction is issued for all of the foregoing sections upon the posting of security with this Court in the amount of $50,000.00. In all other respects, the plaintiffs' motion for preliminary injunction is, hereby, **DENIED.**

---

**10.** Pre–1995 La.R.S. 56:305(B)(12) stated, "Gill Nets: twenty-five dollars to use any legal number of gill nets in the freshwater areas of the state and two hundred and fifty dollars to use any legal number of gill nets in the saltwater areas of the state.