Filed: November 6, 2002

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

———————————

No. 99-1991
(CA-99-828-2-23)

———————————

City of Charleston, etc.,

                                   Plaintiff - Appellee,

        versus

A Fisherman's Best, Inc., et al.,

                                   Defendants - Appellants.

———————————

O R D E R

———————————

        The court amends its opinion filed October 31, 2002, as follows:

        On page 3, first full paragraph, line 10 -- the line is corrected to read "of the Constitution of either the United States or the State."

        On page 3, second full paragraph, line 3 -- "Untied States" is corrected to read "United States."

On page 33, footnote 5, line 4 -- "29 U.S.C. § 1983" is corrected to read "42 U.S.C. § 1983."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CITY OF CHARLESTON, SOUTH
CAROLINA, a municipal corporation,
    *Plaintiff-Appellee,*

v.                    No. 99-1991

A FISHERMAN'S BEST, INCORPORATED;
AFB OF CHARLESTON, INCORPORATED;
IVAN MILLER; and the fishing vessel
TRI LINER,
    *Defendants-Appellants.*

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
Patrick Michael Duffy, District Judge.
(CA-99-828-2-23)

Argued: April 3, 2000

Decided: October 31, 2002

Before LUTTIG and MOTZ, Circuit Judges, and
John C. GODBOLD, Senior Circuit Judge of the
United States Court of Appeals for the Eleventh Circuit,
sitting by designation.

Reversed and remanded by published opinion. Senior Judge Godbold
wrote the majority opinion, in which Judge Motz joined. Judge Luttig
wrote a dissenting opinion.

**COUNSEL**

**ARGUED:** David Earl Frulla, BRAND & FRULLA, Washington, D.C., for Appellants. Timothy Alan Domin, CLAUSON & STAUBES, L.L.C., Charleston, South Carolina, for Appellee. **ON BRIEF:** Andrew D. Herman, BRAND & FRULLA, Washington, D.C., for Appellants. Robert G. Clawson, Jr., CLAUSON & STAUBES, L.L.C., Charleston, South Carolina; William B. Regan, REGAN & CANTWELL, Charleston, South Carolina, for Appellee.

---

**OPINION**

GODBOLD, Senior Circuit Judge:

I. *Background*

This appeal concerns whether federal law preempts a resolution of the City Council of the City of Charleston, South Carolina enacted July 21, 1998, relating to its Maritime Center docks. The resolution included these prohibitions, which we have numbered for convenience:

> [Par. 1]: "the use of the Charleston Maritime Center and its appurtenant facilities is hereby prohibited to fishing vessels utilizing pelagic longline tackle, which shall be prohibited from docking or tying up at the Charleston Maritime Center and its appurtenant facilities for any purpose other than to purchase fuel or ice or in the case of a storm or other emergency."
>
> [Par. 2]: "any Lessee or user of any part of the Charleston Maritime Center and its appurtenant facilities shall be prohibited from selling, purchasing, processing or unloading any fish from or caught by pelagic longline fishing vessels."
>
> [Par. 3]: "no billfish or swordfish from any source of any kind shall be sold, purchased, processed or unloaded at the Charleston Maritime Center and its appurtenant facilities."

2

A copy of the resolution is attached as Exhibit A to this opinion.

The City brought this suit in South Carolina state court on November 13, 1998, seeking a declaratory judgment under South Carolina law. It named as defendants two corporations that were seeking to operate the Maritime Center. We describe them as the "longline defendants" and as "AFB." The City alleged that it was entitled to lease the Maritime Center for operation, as directed by the resolution, under provisions of the South Carolina Constitution and the South Carolina Home Rule Act, and that such operation of the Maritime Center would not violate the rights of the longline defendants under the Constitution of either the United States or the State of South Carolina, nor would it violate any federal or state law. The City also asserted that the longline defendants had made known that they would seek to enjoin any attempted use of the Maritime Center in accordance with the resolution, and it sought a judgment that its proposed use was constitutional and legal in all respects.

The defendants responded, alleging the resolution and implementation thereof violated the Supremacy Clause, Due Process Clause, Equal Protection, and Commerce Clause of the United States Constitution as well as the Due Process and Equal Protection Clauses of the South Carolina Constitution and the South Carolina Home Rule Act. They alleged that the resolution and its implementation were preempted by federal law. The defendants admitted that they would seek to enjoin any attempt by the City to use commercial facilities at the Maritime Center in any way that excluded longline fishing.

Ivan Miller and his vessel the Tri Liner intervened and removed the case to the United States District Court for the District of South Carolina.

After a hearing on June 22, 1999 the court granted summary judgment to the City on all claims and the following day entered a judgment to that effect. Both the order and judgment stated that the resolution did not violate "the United States Constitution or the laws of the State of South Carolina as presented to this court." App. at 340, 363.

3

We set out the background in detail and necessary definitions.[1]

Pelagic refers to fish that live in ocean waters. Swordfish are a highly mobile species (HMS) of pelagic fish that move freely in ocean waters of the world, including waters off United States coasts. HMS are subject to many statutory provisions and regulations that do not apply to other species.

An FMP is a fishery management plan for a geographical region, prepared under United States law by a statutory regional council (or the Secretary of Commerce). A council serves as a regulator, planner, and sometimes enforcer in fish and fishery matters. Section 1853(a) contains provisions that must be included in an FMP and must be consistent with national standards.

Waters from the South Carolina coastline seaward for three miles are state waters. From the seaward boundary of state waters out to 200 miles from the coastline are federal waters known as the Exclusive Economic Zone (EEZ), created by proclamation of the President. Proclamation No. 5030, 48 Fed. Reg. 10605 (March 10, 1983). The United States claims sovereign rights and exclusive fishery management authority over fish and fishery resources within the EEZ. § 1811.

Shrimping and longline fishing for swordfish are the two major components of the fishing industry in waters off the South Carolina coast. Over ninety-eight percent of the swordfish catch made by swordfish vessels in waters off South Carolina is made with longline tackle. Longline fishing tackle employs long lines, two to thirty or forty miles in length, with shorter lines attached at intervals carrying baited hooks. Letter from Chairman South Carolina Natural Resources Board to the Secretary of Commerce 1/16/98. App. at 182. It is a relatively new method of fishing in this country, developed over the past twenty to twenty-five years. Substantially all commercial swordfishing occurs in the EEZ.

---

[1] Most of the many citations to statutes in this opinion are to Title 16 of the United States Code. Therefore, for all references to sections of Title 16 we will utilize only the section number. Citations to other statutes will include the Title number.

4

Waters off the South Carolina coast are a highly desirable locale for swordfish fishing. Swordfish migrate there for reproduction and nurturing. This produces an abundance of swordfish, especially small fish. Most of the commercial fishermen landing fish off South Carolina fish from the Florida Straits (south tip of Florida) to Cape Hatteras (in North Carolina). *Briefing Paper, Concerning the Pelagic Longline Fishery Off South Carolina A Special Report to the Marine Advisory Committee, South Carolina Department of Natural Resources, Marine Resources Division, Office of Fisheries Management*. App. at 195. Some of these vessels are transients that follow fish up and down the Atlantic coast, some as far north as New England.

In the late 1980s the commercial fishing industry in the Charleston area was in distress. Hurricane Hugo damaged vessels, docks and other facilities. The Mayor of Charleston was approached by a representative of shrimpers who requested that the City help the fishing industry. The City responded. It retained an expert in seaport planning to evaluate market support by commercial fishermen for dock space at the Maritime Center, an existing dock site owned by the City. The expert's report described the fishing industry as contributing strongly to the state's cultural diversity and identity, particularly in coastal counties, and to South Carolina's international commerce since much of its seafood harvest is sent out of state. The report also described a decline in economic health of the Charleston community. It identified Shem Creek, a privately owned dock not far from the Maritime Center, as Charleston's closest link to the commercial fishing industry. The expert reported that within approximately 100 miles of Charleston, except for the Maritime Center, there was no major landing dock for fin fish (i.e., not shrimp) that serviced transient offshore vessels.

Both shrimpers and fin fishers were reported to suffer from want of dock space and services at nearby Shem Creek. Moreover, it noted the Shem Creek facility was under threat of closing because of gentrification in the area and possible better uses for the site. It closed during the pendency of this case. According to the expert, for transient boats fishing off South Carolina, the site proposed by the City for development had an advantage over Shem Creek and other South Carolina ports because it was adjacent to the Charleston Port Authority's

5

deep-water channel. *Executive Summary, Market Analysis by ZHA, Inc.* App. at 299. Transient vessels particularly benefitted from access to the deep-water channel because they are larger than many local boats and their captains need not become closely familiar with local waters and tidal conditions in order to dock there. *Id.* at 299.

The expert addressed what he termed to be the most critical need of the local commercial fishing industry: docking space and essential dock-related services. *Id.* at 300. His report then said:

> Besides this accommodation for shrimp landings, other handling and marketing/distribution activities at the facility will be oriented toward long-line fin fishermen. These include both local and non-local fishermen who follow high-value migratory species, particularly swordfish and tuna. The orientation toward long liners will complement the local shrimping activity. Executive Summary, Market Analysis Regarding Commercial Fishing Demand for Dock Space at the City of Charleston's Fishing Industry Waterfront Development.

App. at 300.

The City concluded that the commercial fishing industry was on a slow and constant decline. The number of transient out-of-state vessels coming to Charleston was declining. John Deehan, Director of Revitalization for the City of Charleston, described the situation this way: without help, families that engaged in fishing and shrimping in South Carolina were going to be "out of business and gone." App. at 295. The City completed a plan to extend and improve the Maritime Center. It requested an Economic Development Agency (EDA) grant of $2,150,000 and agreed to designate for the project an acre of waterfront land valued at $1,600,000.

The City stated its intent to lease the Maritime Center to a private sector business or a cooperative "for the benefit of the shrimpers/fishermen." It proposed to demolish two existing docks, rebuild a permanent dock, construct a floating dock, build and equip a fish market, and purchase an acre of adjoining land. The project would provide home port facilities for thirty large long-haul vessels. In addi-

6

tion to dockage, the proposal provided for marketing catch through a retail and wholesale outlet, an administrative infrastructure to handle business affairs of the revitalized fishing industry, and a restaurant that would use local catch.

The proposal did not indicate or imply that longline fishermen would be excluded from the facilities or that swordfish, their principal catch and an important food source, would be barred. Nor did it indicate that any plans the City might have for non-commercial development in the area were part of the Maritime Center. It expressed no concern about possible adverse effects of the project on nearby facilities. The Mayor told the City Council that having boats tie up at Charleston would be historically accurate, attractive, and appropriate for waterfront use and that the availability of fresh seafood would be an economic benefit to the area.

An EDA grant of $2,100,000 was approved. The leasing provision in the grant's Special Terms and Conditions provided:

> Any leasing or renting of the facilities involved in this project shall be subject to the prior written approval of EDA. Prior to EDA granting said approval, it must be satisfied, *inter alia*, that said lease arrangement is consistent with the authorized general and special purpose of the grant; that said lease arrangement will provide adequate employment and economic benefits for the area in which the property is located. . . .

Before the dock project began the City was developing a non-commercial area on the waterfront to include parks, walkways, natural areas, an aquarium and public access to the water. This project was managed by the Charleston County Park and Recreations Commission (PRC). Voters of Charleston County had approved a bond issue with proceeds to go to PRC to develop non-commercial areas of the waterfront. The City agreed that PRC would lease the proposed maritime development, supply expert management for it, and sub-lease its facilities to users.

The City agreed to subsidize PRC for five years for the difference between the amount PRC would receive from the on-site operator and

7

the amount PRC would pay the City as primary lessee. The subsidized revenues were to come from parking fees at the City's waterfront facilities.

PRC, as primary lessee, set about to sub-lease the commercial facilities to an on-site operator pursuant to its procurement policy, which required competitive bidding. PRC distributed a request for proposals for an interested party to manage a full-scale commercial pier, sub-lease moorings to commercial shrimpers and fishing vessels, and operate related support facilities such as a retail/wholesale packing facility and fuel and ice. The request contained no limitations on the kind of tackle or methods of fishing that users of the facility should employ. Rather, it referred generally to commercial shippers and commercial fishermen. It did not address City efforts to develop non-commercial facilities in public areas of the waterfront.

Pursuant to the request for proposals, PRC selected as operators the original defendants in this case, A Fisherman's Best, Inc. and Low-Country Lobsters, Limited. LowCountry was later incorporated as "A Fisherman's Best of Charleston, Inc.," to operate a retail fish market at the Maritime Center under a sub-lease from AFB.

The AFB proposal included plans to lease dock space to several longline fishing vessels and to perform services for them. Included were its plans to attract to Charleston twelve fishing vessels, four that AFB owned and four that had traded with AFB at other sites. AFB also planned to locate a fish market on the premises. PRC issued a letter of intent to award the sublease to AFB as operator and entered into negotiations with AFB for terms.

A bitter public controversy arose in Charleston involving newspapers, television, radio, public meetings, and organized protests against public figures including the Mayor. During the spring and summer of 1997 a sunburst of events occurred. The precise sequence is not always clear from the record, but the tide of events, the roles of players, and their relative positions are clear.

Recreational and sport fishing interests in Charleston opposed the project for improving the Maritime Center. Generally they oppose commercial longline fishing and longline fishing for swordfish. They

regard swordfish as a top trophy for saltwater sports fishermen and they compete with commercial fishermen for available swordfish. In Charleston they asserted that the swordfish stock was decreasing and they feared that additional demands on the stock might destroy the species. They felt that the improved facility would attract more transient vessels to fish for swordfish in the EEZ, which would increase pressure on swordfish resources off South Carolina. They submitted that swordfishing contributes excessively to by-catch (fish caught and discarded because not desired or too small), especially small swordfish that must be thrown away. They viewed swordfishing and swordfish vessels as disastrous to the environment. They considered government regulation of fish and fisheries as slow and inefficient and felt that management of swordfish by the United States and by international entities is not satisfactory.

On the other hand commercial swordfish fishermen and their proponents felt that they had been "ganged up on" by politicians, the South Carolina Department of Natural Resources Board, and the National Marine Fishery Services (an agency of the Commerce Department to which the Secretary has delegated some of his fish and fish management responsibilities). They pointed out that they make their living in a highly-regulated and legally-defined industry and must compete for swordfish with persons who fish only for sport. They considered that they lack political and public support comparable to that enjoyed by more affluent sportsfishermen. They felt that they are branded as dishonest and as having no concern for the health of fishing resources. They pointed to the significance of swordfish as a food resource and to the emphasis placed by Congress on this function. They felt that they are the chief supporters of government regulations.

Recreational Fishing Alliance (RFA) entered the controversy. RFA is a national non-profit organization whose stated purpose is rebuilding and preserving fisheries in the United States. It seeks to politically organize non-commercial saltwater anglers and to advance their interests, protect jobs in the marine boat and tackle industry, and ensure the long-term sustainability of our nation's saltwater fisheries. It is allied in principle to sport and recreational fishing and generally opposes commercial fishing. It seeks to end longline fishing as an acceptable method of commercial fishing. RFA sent representatives

9

to Charleston and became involved in the public controversy for two months or more. It wrote letters, contacted local officials and raised public consciousness. At public forums held by PRC, the President of RFA denounced longline fishing. By mail, newspapers and radio persons were urged to protest to the Mayor against alleged use of City tax funds to bring out-of-state fishing vessels to South Carolina waters. Substantial political presence arose in opposition to the project.

On May 5, 1997 a public meeting was held by the City Council at which a group of panelists participated in a question and answer period concerning the proposed development. One of the speakers was John Deehan, Director of Revitalization for the City. He did not represent that he was speaking for the City. He described pressures on the commercial fishing industry and recommended creation of an infrastructure at Charleston as a permanent home for the fishing industry along with other uses. He spoke of the possibility of using the proposed Maritime Center facility as a site for fishing tournaments and other special events.

Deehan explained that PRC had entered into a master lease agreement with the City that had been sent to EDA and approved by it and thus that PRC had "become a part" of the agreement with EDA. Deehan described numerous newspaper articles that, from the beginning of the proposed development, had classified it as redevelopment of the fishing industry and referred to it as "concerning commercial shrimping and commercial fishing." He explained that PRC's request for proposals for an operator for the Center did not specify the kind of tackle that fishermen using the Center were to use:

> We don't do that. We can't tell people what kind of tackle to use. We said [in the requests for proposals] commercial shrimpers and commercial fishermen.

App. at 281.

Deehan explained that the EDA grant required that as soon as the facility was completed it was to be operational for the purposes of revitalizing the commercial fishing and commercial shrimping industry. He projected this would occur during the current month. App. at

10

284-85. He anticipated equal access by shrimpers and fishermen. App. at 286. With specific respect to longlining, Deehan explained:

> The city really feels very strongly that the city is not authorized to be in the regulatory business and that PRC is not in the regulatory business either. It's legal. Longlining is legal, and it is sanctioned and regulated by the Federal government.

App. at 286.

He described longline fishing as a migratory industry, members of which have been fishing for years in waters off South Carolina. Longliners move from Florida to Maine and "go where the fish are." He stated that the changing of laws governing migrating longline vessels is a matter for legislators and not for the City or PRC. App. at 287.

With respect to fishing tackle Deehan was asked:

> COMMISSIONER MATHER: Mr. Deehan, I have a question. Would the Maritime Center be in compliance with the grant if it severely restricted and/or eliminated one type of tackle for the fishing fleet for the Maritime Center?
>
> MR. DEEHAN: I suspect that's a legal question, and I'll try to do my best in answering it. Since the longline fishing fleet is licensed by the Federal government and regulated by the Federal government, is [sic] says to me that that is a legal practice.

App. at 291.

A questioner suggested that the Maritime Center was to be set up as a private business and inquired whether the Center could decide what businesses it wanted to service. Deehan responded:

> MR. DEEHAN: Mr. Chairman, if I may state to the commission, public entities are held to a different standard than the private sector. We know that from our activities in the

11

city with the city market. With any business that the city or PRC operates, we are held to a different standard. We are not private sector.

App. at 292.

Deehan was asked why the lease to PRC could not be changed, and he replied that he had discussed this with EDA and had been told that the grant could not be amended and that the lease, as part of the grant, could not be amended, and that legally it was required that the specific purposes for the grant be carried out. App. at 290. He was asked why a seafood packaging plant (a processing facility to be part of the Maritime Center development) was to be located in the middle of a tourist section. He replied:

> [The expert planner] gave us the Waterfront Park, which is a world class park and certainly the finest in the low country. I don't think anyone that has been there can dispute that because it's a really fine waterfront park.
>
> We have designed a facility for the shrimping and fishing industry and for the recreational industry. There is a second pier, which we seem to forget talking about. We suspect that the fish smells the same whether it's on a recreational boat or on a shrimp boat or on a commercial fishing boat. It's all fish. We designed a facility that we think will handle that.

App. at 294.

Deehan noted that in the past year thirty-five or forty boats had off-loaded their catches at the Maritime Center. The improved Center would, he said, have a capacity of thirty boats, presumably fifteen for shrimpers and fifteen for commercial fishermen. Also, Deehan noted that the EDA grant and the lease specified commercial shrimpers and commercial fishermen as users and did not refer to recreational fishermen.

Construction proceeded. A new dock was built. An existing dock was repaired. A building was constructed to house business affairs of

12

fishermen. Space was provided for a restaurant, space for processing fish, arrangements for fuel and ice, and parking space for trucks. Arrangements were made for thirty slips, fifteen for shrimpers and fifteen for longline fishermen. The total cost of completion was approximately $10,000,000.

As the summer wore on the Mayor received numerous protests against plans for the Maritime Center. A new issue that surfaced was whether, if longline vessels were not permitted to dock, the City would be required to repay to the government the EDA grant of federal funds.

On May 28, 1997, PRC terminated arrangements with AFB. AFB contends that it had a contract with PRC and had begun performance of some of the operations at the Center even though no agreement had been signed. The City says no agreement had been reached.

On June 12, 1997, in reply to a letter from a constituent, the Mayor said that the three major purposes of the Center were:

> — provisions for a long-term home for the commercial shrimping and fishing industry;

> — offering a pier for special events such as sailing races, fishing tournaments, docking for visiting tall ships and;

> — providing the public with more access to the harbor via the waterfront park, promenade and public pier.

App. at 303-04. The Mayor said that a new request for a proposal for an operator had been reworked with the help of a state agency. And he went on to say:

> The new request for proposals is set up to encourage "fishery friendly" proposals, requires that all proposals operate within federal and state laws and requires that at least 50 percent of the pier be dedicated to shrimpers. . . . The EDA grant which funded the commercial pier requires that the facility be developed to support the commercial fishing industry.

13

App. at 303-04.

The new request for proposals was distributed. It did not refer to limiting or restricting longline vessels from operating out of the Maritime Center. It stated that it did not intend to attract new fishing pressure to waters off South Carolina and that it limited commercial fishing vessels to fifty percent of the total slips.

On July 17, 1997 the City revealed a fundamental change in its position. The Mayor held a meeting in his office at which one or more representatives of RFA were present. He explained that originally he had not been familiar with longline fishing but had learned of the harmful consequences it created; therefore, he was changing sides and would support the recreational fishermen. On or about that time the City Council authorized the Mayor to cancel the contract with PRC as primary lessee and to enter into a month-to-month contract with an operator.

On July 24, 1997 the AFB group, joined by longline fishermen and their vessels, filed an anti-trust suit in the United States District Court for South Carolina against RFA and Carolina Harbor Partners (CHP), a group composed of persons who wished their group to be selected as operator of the Maritime Center but whose response to the request for proposals had been rejected as untimely. The Plaintiffs alleged a conspiracy between RFA and CHP, restraint of trade, and interference with competition in violation of the Sherman Act, 15 U.S.C. § 1, and § 39-3-10 of the South Carolina Code of Law. They also alleged related state claims of interference with a contract or a prospective contract and defamation. The City was not a party.

The district court decided the anti-trust case in June 1999. It granted summary judgment to RFA on all claims, holding that RFA was exempt from anti-trust activity under the *Noerr-Pennington* doctrine. *See Eastern R.R. Presidents Conference v. Noerr Motor Freight*, 365 U.S. 127 (1961); *see also United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965). Plaintiffs appealed. That case is pending before this court as No. 99-2186 and is decided contemporaneously with the present case.

14

The plaintiffs in the anti-trust case brought another suit in state court against the City and CHP, alleging breach of contract and tort claims. We are informed that it has been dismissed.

The Maritime Center opened for business on September 1, 1997. According to the City, based on information and belief, prospective operators of the Maritime Center had not responded to a request for proposals for an operator because they feared that the defendants and others similarly situated would seek to enjoin operation of the Maritime Center as long as longliners were not permitted to participate.

In early October 1997 the Mayor took part in a radio show. He was asked about the anti-trust suit against the City and whether barring longline vessels from the Center was a penalty against a legal industry. He responded:

> Mayor: It is a legal industry. . . . . I didn't know what longline fishing was until about 5 or 6 months ago, but we indicate that the practice of longline fishing is threatening a resource and we felt after becoming familiar with this that the appropriate road for the City should be to support reasonable conservation measures and I am very comfortable with our decision.

App. at 302.

Asked whether longline vessels would be able to tie up at the Maritime Center the Mayor responded:

> We felt that after, you know, worrying about it, that we shouldn't use a pubic [sic] facility in a manner that could increase pressures on the resource and that we have came to fear that if we allowed longlining that could bring more longliners into the area, which meant more longlining off of our coast. And I became to understand that that was wrong and the reason we are not allowing the sale of swordfish is that swordfish, almost all swordfish that you catch is caught by the longlining method and we felt that we had to be intellectual [sic] honest if we would not having [sic] longliners

15

tie up and use the facility, then we shouldn't sell swordfish either.

* * *

They [longline vessels] could tie up long enough to get fuel and ice. We felt that that was something that constitutionally we couldn't refuse to provide them, but that we felt that we legally could refuse to allow them to use it for their of [sic] practice. And there are private docks in the region that serve longliners, so its not like our action keeps longliners from operating if we didn't felt [sic] we should do it.

App. at 302.

The resolution was adopted July 21, 1998, on motion of the Mayor, one year after he announced that the City would support recreational interests and ten months after the improved Center opened. On November 12, 1998 the City filed this suit in South Carolina state court against A Fisherman's Best, Inc., and AFB of Charleston, Inc., seeking a declaratory judgment that the resolution and the City's operation of the Maritime Center pursuant to the resolution violated neither the federal nor the state constitution nor any law federal or state. The City alleged that it was entitled to lease the Maritime Center, as directed by the resolution, under the Home Rule provisions of Article VIII of the South Carolina Constitution and South Carolina Code Ann. § 5-7-10, *et seq.*, the Home Rule Act. The City alleged that it had undertaken development of a proposed facility that would encompass a commercial facility for shrimping and fishing, docks for seafood packaging and shipping, and a wholesale and/or retail seafood market. It alleged that development of the Maritime Center was part of an ongoing plan of development for the City waterfront and that use of the Maritime Center facilities was inconsistent with the environmental and educational goals of the City and of the nearby aquarium. It alleged on information and belief that prospective operators of the Center did not bid because they feared they would be sued by longliners who would seek to enjoin the operation of the Center as long as longliners were not permitted to participate.

Ivan Miller and Tri Liner, a fishing vessel, intervened as defendants and removed the case to the United States District Court for

16

South Carolina. The defendants alleged in their answer that the City's resolution and implementation thereof is preempted by federal law, 16 U.S.C. § 1801 *et seq*., the Magnuson Fishery and Conservation Act. They alleged that the resolution and implementation thereof violate the United States Constitution, the Supremacy Clause, the Due Process Clause, the Equal Protection Clause, and the Commerce Clause as well as the Constitution of the State of South Carolina. They further asserted that the resolution is arbitrary and outside the scope of the Home Rule Act and was not passed in accordance with the City's regulations and procedures. They admitted that "they will seek to enjoin any attempt by the City to use the commercial fishing facilities at the Maritime Center in any way that excludes longline fishing or any other legal method of fishing." App. at 15. After a hearing, the district court granted summary judgment to the City on all issues. The defendants appealed; we reverse.

## II. *Structure of the Federal Management System*

The system for managing fish and fisheries began with the Magnuson Fishery Conservation and Management Act, enacted in 1976. The Act is carried forward as Chapter 38 of Title 16 of the United States Code, §§ 1801-1883. Regulations governing fish and fisheries appear in 50 C.F.R., Chapter VI, §§ 600-697 (1960), which contains more than 700 pages and includes hundreds, if not thousands, of regulations relating to fish and fisheries.

Regional councils representing geographical areas are key bodies — planners, expediters, enforcers and liaison agencies. The Secretary of Commerce has authority over any HMS fishery located within the geographical area of several councils, including the South Atlantic Council, of which South Carolina is a member. A council must prepare and submit a proposed FMP for consideration and approval by the Secretary of Commerce, except that the Secretary files a plan for an HMS fishery for which he is responsible. An FMP must include specified standard provisions, § 1852(B)(a), and it may include discretionary provisions as well. The FMP becomes a guidebook for all fishermen who fish within the designated borders of the Council (or the Secretary's designated area).

Statutes of the United States have brought actions of international bodies into our country's regulatory system for fish. The United

17

States is authorized to participate in international agreements, § 1821, and the Secretary of State is authorized to negotiate and renegotiate them. § 1822. Agreements concerning HMS are specifically authorized. *See* § 1822(e).

The United States is a member of the International Convention for the Conservation of Atlantic Tunas (ICCAT), a multi-national cooperative management body consisting of more than twenty nations. The convention meets annually to review and revise scientific and catch information for various species of fish including swordfish. An important task is recommending quotas for fish allocated to each member nation.

Congress has implemented ICCAT by the Atlantic Tunas Convention Act, § 971 (ACTA). The United States receives reports and recommendations of ICCAT and accepts or rejects them. If recommendations are accepted, regulations are promulgated to carry them out. This source of regulations is important because swordfish are an international fish, an HMS, in which many nations have interests and assert rights. Many provisions of the United States regulatory system for swordfish have originated in ICCAT and through United States statutory procedures have been adopted as part of the federal regulatory system. These include such matters as size, mortality, quotas, allowable catch, and sanctions to enforce quotas.

III. *Preemption: An Overview*

The Supremacy Clause, Article VI, Clause 2 of the Constitution provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby; any Thing in the constitution or Laws of any State to the Contrary notwithstanding.

Preemption concerns allocation of power between state and federal action, that is, whether state law conflicts with valid federal law.

18

Federal law that may give rise to preemption may be the Constitution itself, or a valid act of Congress fairly interpreted. *McDermott v. State of Wisc.*, 228 U.S. 115, 132 (1913); *Savage v. Jones*, 225 U.S. 501, 533 (1912). Regulations duly promulgated by a federal agency pursuant to a Congressional delegation have the same preemptive effect as a legislative enactment. *Hillsborough County, Fla. v. Automated Med. Labs.*, 471 U.S. 707, 713 (1985). A fishery management plan created pursuant to federal law may preempt.

The issue before us is not whether this court favors the commercial fishing industry, particularly longline swordfish fishing, or favors recreational fishermen and environmentalists and the policies they favor. Rather we must determine whether state action, in the form of the City's resolution, interferes with or is contrary to the laws of Congress, made in pursuance of the Constitution. *Wisconsin Pub. Intervenor v. Martiner*, 501 U.S. 597, 604 (1991).

The ultimate touchstone of preemption analysis is the intent of Congress. *Malone v. White Motor Corp.*, 435 U.S. 497, 504 (1978). One of the most familiar recitals is that federal and state law conflict when "the state law stands as an obstacle to the accomplishments of the full purposes and objectives" of federal law. *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984).

There may be express preemption where Congress in express terms has declared its intention to preclude state regulation in a given area. Neither party contends that there is express Congressional intent in this case.

Implied preemption occurs where Congress, through the structure or objectives of federal law, has impliedly precluded state regulation in the area. State action may be in direct conflict with federal law, which is most quickly apparent when the federal and state enactments are directly contradictory on their faces. But state and federal laws need not be contradictory on their faces for federal laws to supercede. State action may be struck down even if it does not prohibit the very act that federal law requires. It may be struck down if it is in "actual conflict" with precise and sufficiently narrow objectives that underlie the federal enactments. Also, federal and state law conflict when it is impossible to comply with both state and federal law. Direct conflict

19

may be implied. Conflict preemption may occur when Congress did not necessarily intend preemption of state regulation in a given area but the particular state law conflicts directly with federal law or stands as an obstacle to the accomplishment of federal objectives. *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 203-04 (1983).

Field preemption may occur when the federal scheme of regulation of a defined field is so pervasive that Congress must have intended to leave no room for the states to supplement it:

> [W]here a multiplicity of federal statutes or regulations govern and densely criss-cross a given field, the pervasiveness of such federal laws will help to sustain a conclusion that Congress intended to exercise exclusive control over the subject matter.

Laurence H. Tribe, *American Constitutional Law*, § 6-31, at 1206-07, *citing Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Employees of Am. v. Lockridge*, 403 U.S. 274, 296 (1971), at fn. 13.

The present case is a paradigm of multiple statutes and regulations, and varying governmental institutions, pervasive in depth, breadth and detail, in a regulatory system that Congress intends to be national in character. The system has been described as being as tightly regulated as atomic energy. The Eleventh Circuit has said that the legislative history of the Magnuson Act preempts the entire field of fishery management of the EEZ. *Southeastern Fishery Ass'n., Inc. v. Chiles*, 979 F.2d 1504, 1509 (11th Cir. 1992). Whether holding or dictum is not clear.

### IV. *The Ruling of the District Court*

The district court erred in granting summary judgment based on the existence of "other landing spots." The court correctly set out that not all regulation concerning the fishing industry is preempted by the Magnuson Act. It then turned to whether state action is preempted in this case. It noted in a single sentence that an FMP was in effect in the EEZ off the coast of South Carolina (presumably not the new

20

FMP adopted three weeks earlier). It noted that the resolution did not set a number of fish or of poundage for a catch. The only reach of the resolution, the court held, was to deny every longliner access to the Maritime Center as a place to land its fish. But the court found longliners are not prohibited from landing their catch in any place other than the Maritime Center and they continue to fish off the coast of South Carolina and land their catch in South Carolina — "they just use other landing spots." This limited effect on longliners was insufficient, the court held, to raise a material issue of fact concerning conflict between federal law and state law — i.e., there was no conflict over denial of landing places because everybody could find a landing place. This analysis is plainly erroneous as a matter of fact and incorrect as a matter of law.

The finding that no one is harmed because everybody can find a landing spot somewhere is inconsistent with the finding of experts who had been employed by the City to appraise the most critical need of the commercial fishing industry of Charleston and had found that the need was space for vessels to dock and to secure related services.

One of the expert planners testified that there was no other deep-water port within 100 miles of the Maritime Center serving transient vessels. Evidence described the Maritime Center dock as superior in quality because of its access to a deep-water channel. The court mentioned Shem Creek nearby but noted that it was scheduled to close, and it did close during the pendency of this case.

Landing rights embrace more than a dock at which to unload the catch. The existence of "other spots" and "other landing places" does not establish that they met the need for landing facilities. Names in the record refer to several "landing places," or places having unloading docks. Two places were said to be located in the same county as the Maritime Center. Distances of others from open waters were not indicated. And it was not shown that any one or more of these landing places has comparable or otherwise adequate facilities like those at the Maritime Center or at other full service docks, such as assistance in unloading, fuel, refrigeration, communication, agents on hand to buy cargo at the site, facilities selling food and other expendable items needed for another voyage, safety from storms, deep enough water for safe approach, truck transportation for purchasers to move

21

fish purchased, adequate parking spaces, facilities for processing, and the like. The availability of "one stop service" is important for saltwater fishing vessels. They need to dock, unload promptly, dispose of their cargo, refuel, buy supplies and head back to sea.

There is no substantial evidence to support the conclusion that the need for landing places is met by merely naming other sites where one may unload.

One who unloads his swordfish at another "landing spot" that lacks refrigeration, storage, marketing, processing and handling could not take his cargo to the Maritime Center to meet these needs, since paragraphs 2 and 3 of the resolution would not permit him to unload at the Center or to have the cargo handled or processed or sold there.

V. *The 1996 Act: A New FMP and New Regulations*

Before 1996 management of HMS had been implemented by FMPs covering them and other species jointly.

The 1996 Congress added significant provisions to the system of managing fish and fisheries. It readopted the Magnuson-Stevens Act. It adopted a new system governing identification, testing and approval of fishing gear, now appearing in § 1855 *et seq.*, P.L. 104-297, 539 (1996). The Secretary of Commerce was directed to complete a comprehensive study on the feasibility of implementing a comprehensive management program for HMS participating in fisheries for Atlantic HMS, which included swordfish. § 109(H), Pub. Law, 104-297, *as amended*, Pub. Law 104-108. Waters off South Carolina are within this specially directed fishery to be studied by the Secretary.

A panel was appointed under the authority of the Magnuson-Stevens Act and ATCA. It included representatives of academic organizations, regional councils involved in HMS management, Atlantic and Gulf Coastal States, and ICCAT. The panel met seven times. National Marine and Fisheries Service (NMFS), an agency of the Commerce Department, distributed a scoping document to serve as a starting point for consideration of issues. It described major issues, including legal requirements for management and potential manage-

ment measures. This document was the subject of public hearings and provided a mechanism for public input.

A draft FMP was circulated in October 1998 with a comment period to end on March 12, 1999. A copy of this draft is in the record of this case, but the district court did not refer to it at the summary judgment hearing or in its order.

A proposed rule that accompanied the draft FMP was published in the Federal Register on January 20, 1999. After the comment period expired on March 12, 1999 NMFS held more than twenty public hearings in communities from Texas to Maine and the Caribbean. An Executive Summary of the proposed FMP was issued in early April which listed fishing proposed for approval for North Atlantic swordfish. It said:

> *The U.S. directed fishery for north Atlantic swordfish is confined by regulation to two gear types: longline and handgear. Pelagic longlining accounts for approximately 98 per cent of U.S. directed swordfish landings.*

Executive Summary, Final Fishery Management Plan for Atlantic Tuna, Swordfish and Sharks, April 1999, p. 45.[2] (Emphasis added.)

A formal rule approving the FMP and regulations implementing it was issued May 28, 1999, less than thirty days before the district court decision was entered in this case on June 22, 1999. It is styled "Fishing Management Plan for Atlantic Tuna, Swordfish and Sharks." It is not in the record and the district court did not refer to it. We take judicial notice of it, however, even if it was not called to the attention of the trial court. 444 U.S.C. § 1507. *See also Golding v. United States*, 219 F.2d 109 (4th Cir. 1955); *Glapion v. MS Journalists*, 487 F.2d 1252 (5th Cir. 1973). The new FMP became effective July 1, 1999, except for a few regulations that do not relate to this case. Formal adoption on May 28 was sufficient to subject the FMP and accompanying regulations to judicial consideration.

---

[2] Including handgear as a permitted gear type is of little significance. It is used primarily by recreational fishermen and accounts for only a nominal percentage of swordfish catches.

23

The new FMP described the provisions of the 1996 Act:

> In 1996, the United States Congress reauthorized the
> Magnuson-Stevens Act. This reauthorization included a new
> emphasis on the precautionary approach in U.S. fishery
> management policy. New provisions of the Magnuson-
> Stevens Act require managers to halt overfishing; to rebuild
> overfished fisheries; to minimize bycatch and bycatch mor-
> tality, to the extent practicable; and to identify and protect
> essential fish habitat (EFH). These provisions are coupled
> with the recognition that management of HMS requires
> international cooperation and that rebuilding programs must
> reflect traditional participation in the fisheries by U.S. fish-
> ermen, relative to foreign fleets. Besides the Magnuson-
> Stevens Act, U.S. fisheries management must be consistent
> with the requirements of other regulations including the
> Marine Mammal Protection Act, the Endangered Species
> Act, the Migratory Bird Treaty Act, and several other Fed-
> eral laws. These laws are described in Chapter 1 of this doc-
> ument. This FMP addresses these new requirements, as well
> as the requirements of other applicable legislation, and
> incorporates the best available scientific information into
> Atlantic HMS management.

*Final Fishery Management Plan for Atlantic Tuna, Swordfish, and Sharks*, April 1999, p. viii.

The FMP described the area from the Florida east coast north to Cape Hatteras (off North Carolina) as a sector in which pelagic longline vessels primarily target swordfish year round. And, it said, smaller swordfish vessels make trips from the Florida Straits (the south tip of Florida) to the Charleston Hump (an area in the waters off South Carolina), while larger vessels migrate seasonally from the Yucatan Peninsula to the West Indies in the Caribbean and as far north as the mid-Atlantic coast of the United States.

The objectives of the new FMP reflect the complex balancing of interests and concerns that culminated in the 1999 final rule. Among the aims of the new FMP were establishing a foundation for the development of international rebuilding programs, analyzing and

implementing management measurements to control bycatch, minimizing social and economic impact to meet the goals of the FMP and the Act, rebuilding overfished fisheries, and bringing about changes that meet the same objectives but with lesser impact on affected communities.

As a consequence of the 1996 Act the federal government began working on a system of closed areas to reduce pelagic longline catch of undersized swordfish, with substantial focus on fishing grounds off the coast of South Carolina.

## VI. *Preemption Applied*

The resolution conflicts in numerous ways with federal laws and, therefore, is preempted.

At the threshold of consideration, it is evident that the resolution is preempted by duly enacted regulations of an authorized federal agency. The resolution forbids access to a vessel utilizing longline tackle. This conflicts on its face with at least three of the regulations adopted May 28, 1999 by the Atlantic Tunas, Swordfish and Sharks FMP that require longline tackle.

Under "General prohibitions" of Fishery Conservation and Management, 50 C.F.R. § 600.725 at 80 (1999), the Secretary of Commerce designated "longline" as the only authorized gear for the Atlantic pelagic longline fishery. Subsection (v) of § 600.725 forbade the use of any gear or participation not on the list of authorized fisheries and gear. It provides:

> (v) The use of any gear or participation in a fishery not on the following list of authorized fisheries and gear is prohibited after July 26, 1999. A fish, whether targeted or not, may be retained only if it is taken within a listed fishery, is taken with a gear authorized for that fishery, and is taken in conformance with all other applicable regulations. Listed gear can only be used in a manner that is consistent with existing laws or regulations. The list of fisheries and allowable gear does not, in any way, alter or supersede any definitions or

25

regulations contained elsewhere in this chapter. A person or vessel is prohibited from engaging in fishing or employing fishing gear when such fishing or gear is prohibited or restricted by regulation under an FMP or under other applicable law.

*Id.* at 76.

Subparagraph (k) of § 600.725 refers to fishing in violation of the Magnuson-Stevens Act. It provides:

> (k) [It is unlawful to] Fish in violation of the terms or conditions of any permit or authorization issued under the Magnuson-Stevens Act or any other statute administered by NOAA [National Oceanic and Atmospheric Administration].

*Id.* at 75.

Subsection (a) of 600.725 makes unlawful many acts done in violation of the Magnuson-Stevens Act and/or any regulation or permit issued under the Act:

> It is unlawful for any person to . . . [p]ossess, have custody or control of, ship, transport, offer for sale, sell, purchase, land, import, or export, any fish or parts thereof taken or retained in violation of the Magnuson-Stevens Act or any other statute administered by NPAA and/or any regulation or permit issued under the Magnuson-Stevens Act.

Part 635 of the Code of Federal Regulation covers Atlantic Highly Migratory Species. Section 635.21 covers gear operation and deployment restrictions. Subsection (b) provides:

> *General.* No person shall use any gear to fish for Atlantic HMS other than those gears specifically authorized in this part. A vessel using or having on board in the Atlantic Ocean any unauthorized gear may not have on board an Atlantic HMS.

26

The gear specifically authorized for swordfish appears in (d)(4):

> *Swordfish*. (i) No person may possess north Atlantic sword-
> fish taken from its management unit by any gear other than
> handgear or longline, except that such swordfish taken inci-
> dentally while fishing with a squid trawl may be retained,
> subject to restrictions specified in § 635.24(b)(2). No person
> may possess south Atlantic swordfish taken from its man-
> agement unit by any gear other than longline.

The resolution also conflicts with Prohibitions under 50 C.F.R.
§ 635.71. Subsection (e), headed "Swordfish," makes it unlawful to
fish for North Atlantic swordfish from, or possess or land North
Atlantic swordfish, on board a vessel using or having on board gear
other than pelagic longline, harpoon, rod and reel, or handline.[3] *Id.* at
223.

The forces that were directed by Congress to prepare an FMP for
HMS in the Atlantic had responded. They had gathered thousands of
views[4] through hearings and responses and submissions by experts
and state and government agents. They had distributed their views as
required by administrative procedures. They had concluded with a
choice of tackle for swordfish. The City, pursuing its own interests
and goals, had made its own choice, diametrically opposed, for fish-
ing tackle and, indirectly for fishing vessels condemned by their use
of gear of which the City disapproved. Compliance with its require-
ments would violate the law.

A hearing on motion for summary judgment was conducted June
22, 1999, eleven months after the City had adopted its resolution and
three weeks after the new FMP had been approved. The transcript of
the hearing contains no mention of the new FMP or new regulations.

---

[3] Including harpoon, rod and reel and handline in the listing of permis-
sible gear has no practical consequences to this case. "Harpoon" was
described by an expert witness in this case as "dead." Rod and reel and
handline are largely used by recreational fisheries. These tackles other
than longline account for less than five percent of the total catch of
swordfish.

[4] More than 5,000 suggestions had been received.

27

In additional ways not so apparent as the direct facial conflict with the new regulations, the resolution conflicts with the national management of fish and fisheries. The record tells the story. Motive or purpose for action may be relevant in determining whether preemption applies. *Building & Construction Trades Council v. Associated Builders & Contractors of Massachusetts*, 507 U.S. 218, 228-29 (1993). The mayor's statements, correspondence with citizens, his radio address, and his testimony in his deposition show that actions by the City were intended to limit or terminate longline fishing for swordfish in the Charleston area. The mayor explained the view of citizens and the City that the City should not spend money on a facility for longline vessels, the view that most of the damages from by-catch are done by longline fishing and that overfishing is the fault of longline fishermen. He expressed the view that federal control should be displaced because local citizens wanted it displaced, and that longline vessels should not berth at the Maritime Center. The record shows how a narrow, limited local issue of whether longline vessels could tie up at the Maritime Center expanded and proliferated into numerous industry-wide issues involving the swordfish industry in waters off South Carolina and non-local vessels that wished to come there to fish.

The record of the issues is revealing, for the resolution extends to the jobs of dock workers forbidden to handle swordfish and even to barring all swordfish from the dock, wherever caught and by whatever tackle.

The conflicts between federal and state law are many. These are a few of them. Congress had found that a national program for the conservation and management of fishing resources is necessary. § 1801(a)(6). It declared its purposes to provide for the preparation and implementation, in accordance with national standards, of fishery management plans, § 1801(b)(4), and its intention to establish fishery management councils, § 1801(b)(5). In § 1851(a) Congress promulgated mandatory national standards with which any FMP must be consistent, and in § 1853(a) it designated matters that must be included in any FMP. In § 1853(b) it set out discretionary provisions that may be included in any FMP. The City's resolution, enacted by a single city council and relating to a single limited coastal area, attempted to impose standards for longline swordfish vessels and

tackle in the area. The resolution conflicted with the above-cited Congressional determinations and therefore is preempted.

Paragraph 3 of the City's resolution undercuts the finding by Congress in § 1801(a) that fish off the coast of the United States and the highly migratory species of the high seas constitute valuable and renewable natural resources that contribute to the food supply, economy and health of the nation.

By § 1811(a) the United States claims, and expresses its intention to exercise, sovereign rights and exclusive fishery management authority over all fish within the Exclusive Economic Zone. The City's resolution attempts to exercise authority over fishing vessels that wish to tie up at the City's Maritime Center facilities, which includes the longline swordfish vessels who make over 95 percent of the swordfish catch in the EEZ. This undercuts the claims of the United States under § 1811(a) and the assertion of management authority over fish within the EEZ.

Under § 1853(b) a fishery management plan may designate zones where, and periods when, fishing shall be limited, or shall not be permitted, or shall be permitted only by specified types of vessels or with specified types and quantities of fishing gear. And the FMP may establish specified limitations for catch, sale of fish, transhipment of fish or fish products; and it may prohibit, limit, condition or require the use of specified types and quantities of fishing gear. The action of the City conflicts with the authority of the Secretary of Commerce, or any council preparing an FMP, to designate specified types of fishing vessels and specified types and quantities of fishing gear and to prohibit, limit, condition or require the use of specified types and quantities of gear.

Section 1812 requires the United States to cooperate with nations involved with fisheries for HMS with a view to ensuring conservation within the EEZ. Under § 1822(a)(4)(B) the Secretary of State is required to initiate and conduct negotiations that provide for the conservation and management of HMS. Under § 1822(e) the Secretary of State must evaluate the effectiveness of international agreements that pertain to fishing for HMS. The resolution undercuts these responsibilities.

29

The City intended the resolution to be an obstacle. Utilization of longline tackle by a vessel was a means to deny access to the docks by longline vessels, and denial of access was a means to control or limit the swordfish industry in waters off South Carolina and to discourage non-local vessels from coming to fish in those waters. The City's opposition was directed at the industry.

## VII. *Alleged Barriers To Preemption*

The City presents several barriers to preemption. First, it says that it is not engaged in regulating anything but if it is regulating anything it is not regulating fish, therefore there is no issue of whether federal fishing law preempts state action. Along with this it describes its resolution as a mere announcement of a policy that longline vessels are not welcome at its dock, that, like a private landowner, it has the right to announce what persons are welcome, to ask those not welcome to leave, and to pursue a remedy of trespass if they refuse. The City asks for the status of a private landowner. The government grant it secured was to meet needs of a state or local area from economic adjustment problems, and the only entities that could secure such grants were a "redevelopment area or economic development district established under subchapter IV of this chapter, an Indian tribe, a State, a city or other political subdivision of a State, or a consortium of such political subdivisions." 42 U.S.C. § 3242 (repealed 1998).

The content of the regulation is not a mere announcement. Paragraphs 1 and 2 are prohibitions, full-blown commands, and paragraph 3 contains a statement of what shall be done. The resolution is directed at specific targets, and it calls on the class to whom it is addressed to conform to specific practice. The City acknowledges that it will pursue a remedy of trespass if needed.

The City's complaint recognizes that the resolution is not a mere statement of how it feels about longline vessels. It alleges that it is entitled to lease the Maritime Center "for operation *as directed by the resolution*." The characterizations of the controversy as a real estate matter, relating only to land-based activities, and not regulating fish or anything else, are mischaracterizations, little more than a play on words.

30

The second barrier alleged is that, as a matter of law, the state has exclusive jurisdiction over state waters, and its resolution is a restraint on only vessels in state waters, therefore there is no issue of federal preemption. But where there is an FMP in effect and the cargo consists of fish that have been caught in federal waters the fisherman is entitled to access to landing facilities to land his catch. *Southeastern Fisheries Ass'n Inc. v. Mosbacher*, 773 F. Supp. 434, 441 (D.D.C. 1991); *Bateman v. Gardner*, 716 F. Supp. 595, 598 (S.D. Fla. 1989), *aff'd*, 922 F.2d 847 (11th Cir. 1990), *cert. denied*, 500 U.S. 932 (1991); *State v. Sterling*, 448 A.2d 785-787 (R.I. 1982); *see also People v. Weeren*, 607 P.2d 1279, 1283 (Cal. 1980). In *Louisiana Seafood Management Council, Inc. v. Foster*, 917 F. Supp. 439 (E.D. La. 1996), the court upheld a restriction imposed by Louisiana that limited the catching or landing to certain fish in Louisiana waters. But there was no FMP. The matter is articulated neatly in *Mosbacher*:

> Because at least four of the five Gulf states prohibit or restrict landing, possession, or sale of redfish, the state laws conflict with the federally imposed quota. Defendants, in effect, have told commercial fishermen that they may catch the fish, but that they may not land them. This makes no sense, and creates a conflict that is impermissible under the MFCA. Defendants' and intervenors' arguments to the contrary are wholly unpersuasive.

733 F. Supp. at 440.

When an FMP is in effect and a fisherman has harvested fish in federal waters and is headed for shore to land his cargo, the state cannot exercise its authority over state waters for the purpose or effect of preventing him from landing at an available facility. Federal and state authority is in conflict and the Supremacy Clause requires that the federal law prevails. The Congressional policy of commitment to a national regulatory system is honored. Congress does not intend Balkanization of our coastlines. Were this not so a state or municipal sovereign owning a dock can effectively bring to its knees an industry engaged in bringing ashore fish caught in federal waters — Boston could shut down codfishing and a California seaport can idle the tuna fleet.

31

The third barrier concerns § 1856. It is not a basis on which plaintiff can escape judicial inquiry into the issue of preemption. Plaintiff has chosen the forum and the remedy. It seeks a declaration that preemption does not apply to this case. It has chosen the party defendant (and others have intervened) and the defendants are called on to answer. Now, in this appeal, the City asserts that the defendants cannot answer.

Section 1856(b) describes administrative procedure by which a Secretary of Commerce can "assume responsibility" for the regulation of a fishery in state waters. We need not set out here the full procedures that the Secretary must follow. After a hearing the Secretary must make two findings of fact that are jurisdictional in the sense that they are prerequisites to his proceeding further. The Secretary must find that the fishing in question is in a fishery which is covered by an FMP implemented under the Magnuson-Stevens Act and that it is engaged in predominately within the EEZ and beyond; and, second, the state must have taken action or omitted to take action the results of which will substantially and adversely affect the carrying out of the FMP. The regulations, § 600.605-610 set out factors that may be considered in determining whether fishing is engaged in "predominately" within or beyond the EEZ and whether relevant effects "are substantial." The City asserts in its brief (Appellee Br. p. 19) "the alleged `regulation' [in this case] does not substantially and adversely effect [sic] the carrying out of a fishery management plan." The City seeks a declaration that its operations are legal. The defendants say that the question of validity is preempted. The City says "you can't bring up preemption, only the Secretary can because he could commence administrative proceedings that would give him sole authority." At the same time the City says "under the facts in this case the Secretary can't acquire authority in this matter." The City may not avoid preemption in this manner.

In numerous cases since 1976, when § 1856(b) was enacted, preemption has been asserted, and considered by the court with no indication that the only entity that could raise the issue was the Secretary of Commerce. *See Louisiana Seafood Mgmt. Council, Inc. v. Foster*, 917 F. Supp. 439 (N.D. La. 1996); *Mosbacher*, 733 F. Supp. at 435; *Vietnamese Fishermen Ass'n of Am. v. California Dept. of Fish & Game*, 816 F. Supp. 1468 (N.D. Cal. 1993); *Southeastern Fisheries*

32

*Ass'n v. Martinez*, 772 F. Supp. 1263 (S.D. Fla. 1991); *see*, *e.g.*, *Livings v. Davis*, 465 So.2d 507 (Fla. 1985); *State v. Sterling*, 448 A.2d 785 (R.I. 1982).

If the issue is considered as one of standing to assert that the resolution is preempted, the defendants meet the requirements of 16 U.S.C. § 1856(b). They have demonstrated that (1) there is an injury in fact, (2) causation and (3) redressability. *See* Laurence Tribe, *American Constitutional Law*, § 3-14, at 386 (3d ed. 2000).[5]

The next defense concerns the "proprietary capacity exception," which, in some circumstances, may be invoked by the sovereign when it acts as owner rather than as regulator. Almost all of the cases involving the issue of preemption arise under the Commerce Clause. The district court did not directly discuss whether there is a "proprietary capacity exception" under the Magnuson Act that would provide the shelter that it seeks. The court did not reach that issue, however, because it held that the ban on landings at the Maritime Center was not sufficient regulation to raise a material disputed issue of fact that would prevent summary judgment. In this court we have held that the summary judgment was not appropriate, so we must address the "proprietary capacity exception" issue. But, before we can determine whether the City's resolution is preempted by the Act we first determine whether there is such an exception to the Magnuson Act.

In *Cardinal Towing & Auto Repair, Inc. v. City of Beford*, 180 F.3d 686, 694 (5th Cir. 1999), the court explored whether preemption could apply to an ERISA case. ERISA states that it preempts any and all state laws so far "as they may now or hereafter relate to an employee benefit plan." State laws include "all laws, decisions, rules, regulations, or other State action having the effect of law, of any

---

[5] In *Maryland Pest Control Ass'n v. Montgomery County, Maryland*, 884 F.2d 160 (4th Cir. 1989), this court held that the federal preemption of local ordinances pursuant to the Supremacy Clause is not actionable under 42 U.S.C. § 1983, therefore that section does not support an award of attorney's fees under § 1998. The defendants in this case do not assert a § 1983 claim based on preemption. They are defendants in a declaratory judgment suit which asserts that preemption does not apply and are called on to affirm or deny whether that allegation is correct.

33

state." See 29 U.S.C. § 1144(c)(1). The court held that this definition of state laws does not include state action that does not have the effect of law. *See Cardinal Towing*, 180 F.3d at 694. Therefore the Fifth Circuit concluded that "the text of the statute allow[s] for the proprietary analysis." *See id.* Hence, ERISA expressly created a proprietary capacity exemption to the preemption doctrine.

In *Building & Construction Trades Council v. Associated Builders & Contractors of Massachusetts*, 507 U.S. 218 (1993), the Court looked to the goals behind the passage of §§ 8(e) and (f) of the NLRA to determine what Congress intended regarding the State and its relationship to the agreements authorized by the statute. The Court concluded that "it is evident from the face of the statute that in enacting exemptions authorizing certain kinds of project labor agreements in the construction industry, Congress intended to accommodate conditions specific to that industry." *Id.* at 231. Furthermore, "there is no reason to expect these defining features of the construction industry to depend upon the public or private nature of the entity purchasing contracting services." *Id.* Therefore, "to the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity as purchaser should be permitted to do the same." *Id.* Thus the court found that a proprietary exception was implicitly created by the statute.

We have examined the Magnuson Act. We find no explicit provision creating a proprietary exception and the City points to none. Nor does the City point to any basis for concluding that such an exception is implied.

The Magnuson Act lists seven purposes that include: (1) to conserve and manage the fisher resources found off the coasts of the United States; (2) to support and encourage the implementation and enforcement of international fishery agreements; (3) to promote domestic commercial and recreational fishing under sound conservation and management principles; (4) to provide for the preparation and implementation, in accordance with national standards, of fishery management plans; (5) to establish Regional Fishery Management Councils to exercise sound judgment in the stewardship of fishery resources; (6) to encourage the development by the United States fishing industry of fisheries; and (7) to promote the protection of essential fish habitat. § 1801(b).

The City does not say that a proprietary exception may be inferred from these purposes or from any other basis. Rather, it points to what it did as the predicate for existence of an exception. It refers to its passing a resolution as opposed to adopting an ordinance and it denies that it was intending to regulate fish (a denial we have rejected). This alleged state of mind does not appear to have been made known to the defendants, and it is inconsistent with the face of the resolution itself.

The City cannot lift itself by its bootstraps to create in the Magnuson Act, either facially or by implication, an exemption from judicial inquiry into whether its actions are free of accepted principles of preemption. We cannot say that Congress intended that a proprietary capacity exception such as that found in ERISA and the NLRA applies to the Magnuson Act, and we hold that Congress did not so intend.

*Conclusion*

The City's resolution of July 21, 1998 conflicts on its face with duly adopted regulations of the federal government and, therefore, must be held to be preempted.

The resolution conflicts with federal law in a panoply of other ways and must be held preempted.

We have considered the barriers to preemption suggested by the City. None has merit.

On the sole issue of preemption of the City's resolution by federal law the judgment of the district court is REVERSED and the case REMANDED with direction to enter a judgment in favor of defendants.[6]

*REVERSED AND REMANDED*

---

[6] None of the defendants moved for summary judgment in the district court and in this court. This court, on appeal, has power to enter summary judgment for them. *Uzzell v. Friday*, 547 F.2d 801, 805 (4th Cir. 1977), *vacated on other grounds*, 438 U.S. 912 (1978); *Fabris v. Provident Life & Accident Ins. Co.*, 115 F.3d 908, 914-15 (11th Cir. 1997); *Chas. Allen Wright, et al.*, *Federal Practice and Procedure*, § 2762 (3d Ed. 1998).

NOTE: The material below comprises the text of Defendant's Exhibit 1, found at pages 162-164 of the joint appendix.

[seal]

A RESOLUTION TO AUTHORIZE THE MAYOR OF THE CITY OF CHARLESTON TO ENTER INTO MONTH TO MONTH LEASES FOR THE USE OF THE CHARLESTON MARITIME CENTER AND ITS APPURTENANT FACILITIES; TO PROHIBIT THE USE OF THE SAID CENTER AND ITS FACILITIES BY FISHING VESSELS THAT UTILIZE PELAGIC LONGLINE TACKLE; AND TO PROHIBIT THE SALE, PURCHASE, PROCESSING OR UNLOADING OF ANY FISH FROM OR CAUGHT BY PELAGIC LONGLINE FISHING VESSELS INCLUDING BUT NOT LIMITED TO BILLFISH AND SWORDFISH.

WHEREAS, the City Council of the City of Charleston makes the following findings of fact:

1. The waters of the City of Charleston are as much a part of its history and tradition as is its grand architecture. The geographic and economic growth of the City is, and has been, inextricably linked to its waterfront environment; and

2. Over the course of the last thirty (30) years, the City has made concerted efforts to protect its waterfront areas from environmentally insensitive uses, and has been steadfast in assuring and preserving for the public, access to, and use and enjoyment of, its waterfront. These efforts have included the acquisition of a 5 acre park on the western bank of the Ashley River; the acquisition of a 51 acre nature preserve along the shores of Church Creek; the acquisition and development of Brittlebank Park on the eastern bank of the Ashley River; the maintenance and improvement of White Point Gardens; the development of the 13 acre passive Waterfront Park along the western bank of the Cooper River; the acquisition of a 5 acre waterfront site on the Cooper River; and the construction of the South Carolina Aquarium, also on the Cooper River. The City has also been very successful in its

36

effort to acquire land or necessary easements toward the goal of providing an uninterrupted pedestrian path along the water's edge from Brittlebank Park, to the Battery, to the Waterfront Park, to the South Carolina Aquarium, and

3.  These efforts on the part of the City have been pursued to assure to the public perpetual access to the natural environment, and all efforts of the City in the development of these accesses has been undertaken in a manner sensitive to the environment, and in recognition of the importance of these areas to the heritage of the City and its citizens; and

4.  As part of its continuing efforts to revitalize, preserve and make available to the public the water's edge, the City has constructed a Maritime Center on a portion of a 5 acre site on the Cooper River, immediately south of the Dockside Condominiums and the South Carolina Aquarium. The City's purpose in constructing the Maritime Center has been to provide a place for uses, both recreational and commercial, that are consistent with those traditionally and historically conducted on the City's waterfront. To this end, the Maritime Center will include a pier devoted to recreational events and a pier, with supporting facilities, devoted to foster the shrimping and fishing industry that has, historically, been a part of the City's waterfront environs; and

5.  City Council has determined to solicit proposals for the operation of the portion of the Maritime Center that to serve this industry, and in doing so, finds it to be in the public interest, and in furtherance of its efforts to promote its waterfront, to require that this portion of the Maritime Center be operated and used in a manner traditional to such industry and to the City and consistent and compatible with the tenor of other City supported public uses along the waterfront, particularly the Aquarium to the north, and proposed Union Pier and the passive waterfront park to the south; and

6.  The City encourages and promotes creativity in the use and operation of the commercial portion of the Maritime Center, but finds that such proposals must, to advance the City's goal, include elements that foster and enhance the public appeal, enhance the public understanding and appreciation of its delicate maritime resources, enhance

37

the preservation of fisheries resources, discourage fish practices that result in wasteful loss of such resources, and include elements compatible and consistent with the educational and environmental mission of the South Carolina Aquarium and the waterfront park; and

7. City Council further finds that there has been much public debate over the past few months over the depletion of the ocean's fisheries, especially off the coast of South Carolina, and the effect the operation of the Maritime Center will have on these resources. City Council has followed the debate and is concerned that the operation of the Center furthers the goal of preservation of fisheries to the extent practicable, while also protecting the traditional shrimping and fishing industry in their traditional manner of gathering these resources. City Council further finds that pelagic longline fishing practices result in the loss of the great majority of fish caught, both to the consuming public and more importantly, to the fish population, and that such practices are the primary source of swordfish capture; and

8. City Council further finds that all billfish, including swordfish, are the most threatened of species caught off the coast of South Carolina and that it would be incompatible with the goals of the City in establishing the Maritime Center to allow the processing or sale of such species; therefore, no billfish nor swordfish shall be processed or sold at the Maritime Center.

NOW, THEREFORE, BE IT RESOLVED that the Mayor of the City of Charleston is hereby authorized to enter into month to month leases for the use of the Charleston Maritime Center and its appurtenant facilities.

NOW, THEREFORE, BE IT FURTHER RESOLVED that the use of the Charleston Maritime Center and its appurtenant facilities is hereby prohibited to fishing vessels utilizing pelagic longline tackle, which shall be prohibited from docking or tying up at the Charleston Maritime Center and its appurtenant facilities for any purpose other than to purchase fuel or ice or in the case of a storm or other emergency.

NOW, THEREFORE, BE IT FURTHER RESOLVED that any Lessee or user of any part of the Charleston Maritime Center and its

appurtenant facilities shall be prohibited from selling, purchasing, processing or unloading any fish from or caught by pelagic longline fishing vessels.

NOW, THEREFORE, BE IT FURTHER RESOLVED that no bill-fish or swordfish from any source of any kind shall be sold, purchased, processed or unloaded at the Charleston Maritime Center and its appurtenant facilities.

NOW, THEREFORE, BE IT FURTHER RESOLVED that a copy of this Resolution shall be entered into the official Journal of City Council.

IN WITNESS WHEREOF, THE CITY COUNCIL OF CHARLE-SON has caused these presents to be executed in its name by Joseph P. Riley, Jr., its Mayor and by Vanessa Turner-Maybank, its Clerk of Council, and its corporate seal to be hereto affixed this 21st day of July, 1998.

CITY COUNCIL OF CHARLESTON:

(SEAL)

/s/

_____
Joseph P. Riley, Jr.
Mayor

ATTEST:

/s/

_____
Vanessa Turner-Maybank
Clerk of Council

39

LUTTIG, Circuit Judge, dissenting:

I respectfully dissent from my colleagues' disposition of this case. There are two flaws with the majority's opinion. First, it assumes wrongly (with little analysis) that the municipal resolution under review constitutes government regulation, which is subject to preemption, rather than proprietary action of the municipality, which is not, *see ante* at 31, when it is clear that the City acted in the latter capacity when it passed the resolution in question. Second, even were the majority correct in its unexamined assumption that the resolution constitutes regulation as opposed to the exercise of proprietary power, the Magnuson Act does not preempt the resolution because this single jurisdiction's limitation of docking privileges at this single dock does not *actually* interfere with the activities protected by the Act.

As to the first flaw, "preemption doctrines apply only to state *regulation*. [The Supreme Court's] decisions in this area support the distinction between government as regulator and government as proprietor," *Building and Constr. Trades Council* v. *Associated Builders and Contractors*, 507 U.S. 218, 227 (1993) (emphasis added). And, as the district court noted, "[w]hether or not a governmental entity is acting as a market participant is a very fact specific determination." J.A. at 345 (district court opinion). Here, the facts unequivocally demonstrate that the City was "a lessor of its property, [ ] participating in the economic marketplace for the provision of physical marketplaces." *Id*. at 350.

That the City's only remedy when longline fishing boats dock at the Maritime Center lies in trespass as the majority itself acknowledges, *see ante* at 31, confirms that the City acted in its proprietary capacity when it enacted the instant resolution: The resolution has no enforcement mechanism and gains force *only in so far as the City acts like a private landowner* and exercises private property rights that exist independently of the resolution. *Cf. SSC Corp.* v. *Town of Smithtown*, 66 F.3d 502, 512-13 (2nd Cir. 1995) (observing that the attachment of enforcement mechanisms to statutory command indicates that a state is regulating).

Simply, the resolution is a decision by the City, as a participant in the market, as to how it will manage its own property. The citizens

40

weighed in, a legislative decision was made, and now, the City's land is to be managed in conformity with the democratically-derived directive. The only federal restraint imposed on the conduct of a governmental entity acting in such a capacity is the *direct* command of federal law.

Even were the majority correct in its characterization of the resolution as regulatory in nature, the resolution would yet be valid because it does not interfere with activities protected by the Magnuson Act. As the district court held, this single resolution, of a single local jurisdiction, governing a single dock, does not interfere at all, much less significantly, with longline fishing. It does not even prevent longline fishermen from landing within this one City's jurisdiction.

Allowing individual municipalities to prevent longline fishermen from landing in their respective jurisdictions would allow municipalities to produce, piecemeal, conflict such as that held to be preempted in *Southeastern Fisheries Assoc. Inc.* v. *Chiles*, 979 F.2d 1504 (11th Cir. 1992). But when, as here, a municipality does not close its shores, no such piecemeal conflict is even possible. Not only may longline fishermen continue to dock elsewhere along the South Carolina coast, they may continue to dock in the City of Charleston itself — just not at the one dock reached by the resolution.

Appellants failed to contest the City's claims that there are other docks in Charleston Harbor (*i.e.*, also advantageously positioned with respect to being in a deep-water port), at which longline fishermen may dock, unaffected by the resolution. *See* Appellee's Br. at 11-12. Alone, this failure is fatal to appellants' claim.

Appellants did offer testimony that in Charleston Harbor there is currently no other dock site presently complete with all of the services necessary for landing swordfish. *See* Appellants' Br. at 50-51. But none of that testimony creates a genuine issue of fact as to whether dock space that could be configured to land such fish is in fact rendered unavailable in Charleston Harbor by the resolution. In the absence of any evidence contradicting that offered by the City on this issue, the district court was certainly correct to grant summary judgment.

41

The "motive" of the City's officials in enacting the resolution is irrelevant to the actual conflict analysis. *Cf. ante* at 30. Though the majority relies on *Building and Constr. Trades Council*, 507 U.S. at 228-29, to say that motive *is* relevant, the Supreme Court there simply reviewed its analysis in *Wisconsin Dept. of Labor & Indus.* v. *Gould*, 475 U.S. 282, 287-88, in which it inquired into a statute's purpose *by examining the statute's operation. See id*. ("No other purpose could credibly be ascribed, given the rigid and undiscriminating manner in which the statute operates."). It did not hold that individual legislators' motive is relevant to whether state or municipal action is preempted by federal law.

Here, the only relevant inquiry is whether the resolution renders unavailable all, or substantially all, dock space within the City's jurisdiction that could be configured to allow longline fishermen to land their fish. Were this a case in which the municipality had, in some manner, actually prevented such landings, then the argument for preemption would indeed be strong. But this is academic at the moment, because nothing approaching the actual prevention of docking by these fishermen has occurred.

This resolution does not even regulate longline fishing, nor does it prohibit or effectively prohibit such fishing. It merely limits access to one, single municipal dock; other docks remain unaffected by the resolution. As such, there is neither need nor authorization for the heavy hand of federal preemption today sanctioned by the majority.

42